Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Appellant,

v.

CORNING GLASS WORKS, a corporation, Appellee.

No. 72–1590.

United States Court of Appeals, Third Circuit.

Argued May 21, 1973.

Decided June 28, 1973.

Richard F. Schubert, Sol. of Labor, Carin Ann Clauss, Associate Sol., Donald S. Shire, Helen W. Judd, Isabelle R. Cappello, Sylvia S. Ellison, Attys., U. S. Dept. of Labor, Washington, D. C., Louis Weiner, Philadelphia, Pa., Regional Sol., for appellant.

Scott F. Zimmerman, Walter P. DeForest, Reed Smith Shaw & McClay, Pittsburgh, Pa., Robert F. Cox, Cox, Wilcox, Owlett & Lewis, Wellsboro, Pa., for appellee.

Before KALODNER, ALDISERT and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This action was commenced by the Secretary of Labor to enjoin claimed violations of the equal pay provisions of the Fair Labor Standards Act[1] and to restrain the withholding of wages allegedly due certain female employees. The broad issue presented for the Court's

---

1.  29 U.S.C. § 201 et seq.

judgment is whether Corning Glass Works engaged in wage discrimination violative of the Equal Pay Act [2] by paying more to *night* inspectors than to *day* inspectors at its Wellsboro, Pennsylvania plant.

The basic factual pattern involved in this case implicates the Equal Pay Act because, for reasons that will be fully explained, *infra*, before October 16, 1966, night inspection work was performed exclusively by males and day inspection work largely by females. Thus, the Secretary asserts, in essence, that Corning paid male night inspectors more than female day inspectors for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . ." [3] The district court disagreed, and the case is now here on appeal.

I.

The pay practices at the heart of this controversy developed over a period spanning more than forty-five years. Before 1925, Corning operated its Wellsboro Plant only during the day, finding it either unnecessary or undesirable to employ a night shift. All inspection work at that time was performed by women. The introduction of automated production equipment between 1925 and 1930, however, made it necessary or desirable for the first time to use night shifts.

Until 1947, Pennsylvania law absolutely prohibited the employment of women between the hours of midnight and 6:00 A.M.,[4] and thus, in order to fill inspector positions on the new steady night shift, Corning had to hire men. These night inspectors, selected from male employees within the plant, were paid for their night inspection work the individual rates thay had previously been receiving. Such wages were higher than the rates paid to women engaged as inspectors on the day shift. A situation thus developed in which male inspectors worked at night, female inspectors during the day, and the male employees were paid at higher rates.[5]

This wage differential was reinforced when, in 1944, the American Flint Glass Workers' Union organized the production and maintenance employees of Corning's Wellsboro Plant and negotiated a collective bargaining agreement providing, for the first time, a plant-wide night shift differential. Despite this new *shift* differential, serving as a premium for night work, the pre-exist-

---

2. The equal pay provisions were added to the Fair Labor Standards Act as an amendment to § 6(d) of the Act. Enacted by Congress in 1963 to correct certain conditions considered contrary to the country's interest, the Equal Pay Act provides, in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii)

a system which measures earnings by quantity or equality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

3. 29 U.S.C. § 206(d)(1).

4. Act of July 25, 1913, P.L. 1024.

5. After installation of the Stevenson, Jordon & Harrison wage evaluation plan in 1947, for example, the resulting wage differentials between the night and day shifts amounted to a high of 19 cents an hour, in addition to the shift differential of 4 cents an hour for the afternoon shift and 10 cents an hour for the night shift. By 1966, the highest base wage differential was 22½ cents an hour.

ing *wage* difference between night shift inspectors and day shift inspectors continued in effect.[6]

In 1947, Pennsylvania law was amended to permit women to work at night conditioned upon the approval of the State Department of Labor.[7] Under the applicable regulations, however, Corning could have employed women at night only if it would provide them transportation or if Wellsboro had public transportation. It was not economically feasible for Corning to furnish transportation to its female employees, and public transportation was unavailable. The 1947 state regulations were later amended in July, 1965 to permit night work for those women who had regular, private transportation.[8]

Since October 16, 1966, by mutual agreement between the union and Corning, women have been permitted to exercise their seniority, on the same basis as men, to claim steady night shift jobs when vacancies occur.[9] A considerable number of female employees have availed themselves of this opportunity to take the higher-paying night shift inspection jobs.[10] In addition, several new female employees, as well as a new male employee, have been hired to work as night inspectors.[11]

Thus, after October 16, 1966, female and male employees worked as inspectors on both the day and night shifts.

Male and female inspectors working the same shift have been and are paid at the same base hourly rate. Moreover, under the Corning Glass Works Plan of job evaluation installed on January 20, 1969, all employees hired *after* that date are paid the base wage rate for their job regardless of their sex or whether they work on the day or night shifts. The Corning Plan also provides for a "red circle" rate paid to persons employed *before* January 20, 1969, when working as night inspectors. Thus, all inspectors, male or female, who were employed before the date of the Corning Plan and who work on the steady night shift receive a higher base wage rate ("red circle") than their counterparts, male or female, of comparable seniority, working on the day shifts.

II.

After finding the relevant facts, which were largely undisputed, and in any event mostly stipulated by the parties,[12] the district court held that the Secretary of Labor had not established that Corning violated the Equal Pay Act because he had "failed to sustain its burden of proof that the male inspectors on the night shift and the female inspectors on the day shift performed their work 'under similar working conditions,' within the meaning of that phrase under the Equal Pay Act. The district court reasoned that "time of day worked is a working condition," and that "night work has a significant sociological, psychological and physiological impact on most workers."

Urging reversal of the district court's judgment, the Secretary contends primarily that: (1) in view of the legislative history of the Equal Pay Act and

6. See note 5, *supra.*

7. Act of May 21, 1943, P.L. 389, § 4.

8. CCH State Wage and·Hour Citator ¶ 57,849.

9. They may also "bump" into such jobs during periods when the work force is being reduced.

10. The parties stipulated that women filled 276 out of 395 openings on night inspection jobs between October 16, 1966 and June, 1970. Each of the 45 inspector jobs thus became available approximately 8 times during this four year period. No

contention has been advanced that in filling these jobs Corning discriminated on the basis of sex.

11. Several females just hired on March 14, 1967 immediately began inspection work on the steady night shift. In addition, some very junior male employees took steady night work. All qualified employees having greater seniority, whether male or female, could have claimed this work.

12. The parties entered into more than 100 stipulations.

controlling judicial precedents, shift differences are not properly classified as "working conditions" under the statute's equal work standards; and (2) the work performed by men and women is "substantially" equal.

Needless to say, Corning disagrees with the Secretary's arguments as to "working conditions" in every respect. Moreover, the company seeks affirmance of the judgment of the district court on a number of additional, alternative grounds: (a) if shift differentials are not "working conditions," within the meaning of the Act, they represent a "factor other than sex" upon which wage differentials may legally be based; (b) even assuming a prior violation of the equal pay provisions, Corning achieved compliance with the Act by opening all inspection jobs to both sexes in October, 1966; and (c) its allegedly unlawful conduct occurred prior to the period of the statute of limitations and cannot make illegal action within the period of the statute that is otherwise legal.

### III.

■ Initially, the Court must determine whether the day and night inspection jobs constitute "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Upon this issue the Secretary carries the burden of proof,[13] and in determining whether the district court erred in concluding that such burden was not met, we must keep in mind that the Equal Pay Act does not contemplate that the Secretary of Labor and the courts will engage in job evaluation for the purpose of deciding what is a proper wage differential for unequal work.[14]

■ Once the Secretary has met his burden of showing equal skill, effort, responsibility, and similar working conditions, the employer, in order to prevail on the merits, must demonstrate that the wage differential is made "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . ."[15]

The basic issue over which the parties have waged their legal battle is whether time of day worked may properly be classified as a "working condition" within the meaning of the Act. Here, the district court held that steady night work is not performed under "working conditions" similar to day work. However the Second Circuit recently concluded in Hodgson v. Corning Glass Works,[16] a case remarkably similar to the present one, that, in view of the legislative history of the Act, time of day worked may be used by an employer to justify claimed wage discrimination only as "a differential based on any other factor other than sex," but does not constitute a "working condition" so as to make the Act altogether inapplicable.

Writing for the court in *Hodgson*, Chief Judge Friendly, in concluding that a night shift is not a "working condition" relied in no small part[17] upon the following statement from the Committee Report:

> "Three specific exceptions and one broad general exception are also listed. It is the intent of this committee that any discrimination based upon any of these exceptions shall be exempted from the operation of this statute. As it is impossible to list each and every exception, the broad

---

13. *E. g.,* Hodgson v. Corning Glass Works, 474 F.2d 226, 231 (2d Cir. 1973); Shultz v. American Can Co., 424 F.2d 356, 360 (8th Cir. 1970).

14. *See* 109 Cong.Rec. 9197–98, 9209 (1965). Indeed, in view of the exceptions to the Act, it is clear that "Congress thus intended to allow [certain] wage differen-

tials even though the contrasted employers (sic) were performing equal work." Hodgson v. Robert Hall Clothes, Inc., 473 F.2d 589, 594 (3d Cir. 1973).

15. 29 U.S.C. § 206(d)(1).

16. 474 F.2d 226 (2d Cir. 1973).

17. *Id.* at 232.

general exclusion has been also included. Thus, among other things, shift differentials, based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability would also be excluded. . . ." [18]

In quoting this statement, the Second Circuit opinion interlineated the words "differentials based on any other factor other than sex" in brackets after the words the "broad general exclusion" in the next to last sentence in the quoted paragraph, thus revealing its belief that a "factor other than sex" is the "broad general exclusion" referred to by the Committee.[19] Although, in view of the context and language of the quoted statement, Chief Judge Friendly's interpretation would appear to be correct, we do not conclude, as the Second Circuit apparently did, that the last sentence in the quoted paragraph, beginning with the word "Thus," should therefore be construed as listing only examples of a "factor other than sex."

The specific examples that the Committee Report, in the last sentence, states would be excluded are "shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability. . . ." [20] *As a group,* these examples cannot be interpreted as "factor[s] other than sex" for the simple reason that some of them clearly represent requisites to the applicability of the Act: skill, effort, responsibility, and working conditions. Thus, "lifting or moving heavy objects" is, beyond dispute, an example of "effort," and "experience, training, or ability" are examples of "skill." And "effort" and "skill," along with "working conditions" and "responsibility" are specifically listed

requisites that would make the Equal Pay Act altogether inapplicable, and which cannot, therefore, logically be classified as "factor[s] other than sex" [21] to be considered as matters of defense.

Of course, our interpretation of the Committee Report—that the examples set forth are not *all* "factor[s] other than sex"—does not by itself suggest the converse—that they are *all* examples of "skill, effort, and responsibility, and . . . working conditions." Thus, the listing made by the Committee Report may in fact be not simply a set of black-or-white illustrations taken exclusively from the Act's requisites (i. e., effort, skill, responsibility, and working conditions) or solely from one of its defenses ("factor[s] other than sex"), but rather a chiaroscuro picture painted with brushes dabbed in both groups. The question, therefore, remains whether time of day worked is a "working condition" or a "factor other than sex."

The only clear and unambiguous evidence concerning this point is the following statement made during the course of an explanation of the Act by Congressman Goodell, who sponsored the bill and participated in redrafting it:

"Ninth. Although only the factors, skill, effort, responsibility, and working conditions are listed, such things as experience, ability, and training may be considered under the broad heading of skill. The usual factors of push, pull, lift, and carry come under effort. Direction of others as well as value of commodity worked upon and overall importance of assignment may be considered as part of an employees' job responsibility. *Finally, standing as opposed to sitting, pleasantness or unpleasantness of surroundings, periodic rest periods, hours of work, dif-*

18. 109 Cong.Rec. 9210 (1963), U.S.Code Cong. & Admin.News, p. 689.

19. 474 F.2d at 232: " 'As it is impossible to list each and every exception, the broad general exclusion ["differentials based on

any other factor other than sex"] has been also included.' "

20. 109 Cong.Rec. 9210 (1963).

21. 29 U.S.C. § 206(d)(1).

*ference in shift, all would logically fall within the working condition factor."* (Emphasis supplied) [22]

Because of its interpretation of the Committee Report, the Second Circuit discounted this explanation by Congressman Goodell,[23] although it was made by the bill's sponsor immediately before reading the Committee Report into the Congressional Record. In addition, it was proclaimed by Congressman Goodell as an example and guideline as to the intent of Congress. Whatever may be the merits of minimizing the views of a bill's sponsor when a Committee Report is thought to be clear and contrary to the statements of individual legislators,[24] this Court's interpretation of the Committee Report suggests no basic conflict between the Report and Congressman Goodell's statements. A comparison of the two demonstrates this:

| Committee Report: | Congressman Goodell: |
|---|---|
| "Thus, among other things, shift differentials, restrictions on or dif-ferences based on time of day worked . . . would also be excluded . . ." | "Ninth . . . Finally . . . hours of work, differences in shift all would logically fall within the *working condition* factor." (emphasis supplied) |
| "Thus, among other things . . . lifting or moving heavy objects . . . would also be excluded." | "Ninth . . . The usual factors of push, pull, lift, and carry come under *effort* . . ." (emphasis supplied) |
| "Thus, among other things . . . differences based on experience, training or ability would also be excluded." | "Ninth . . . such things as experience, ability, and training may be considered under the broad heading of skill. . . ." (emphasis supplied) |

---

Under these circumstances, where the ambiguous Committee Report and the statements by the sponsor of the legislation may reasonably be read not as conflicting but as complimentary and harmonious, giving emphasis to Congressman Goodell's explanation would not appear inappropriate. Indeed, a sponsor's views are entitled to great weight in any event.[25] As this Court stated in Gartner v. Soloner: [26]

"In attempting to extract the legislative purpose primary concern should always be given to the views expressed by the sponsors of the bill and in this respect the statements of Sena-

22. 109 Cong.Rec. 9209 (1963).

23. 474 F.2d at 232.

24. *See* Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); United States v. O'Brien, 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1967), involving situations of *conflict* between Committee reports and statements of legislators. Cf. American Airlines, Inc. v. C.A.B., 125 U.S.App.D.C. 6, 365 F.2d 939, 949 (1966).

25. *See, e. g.,* National Woodwork Mfgs. Ass'n v. N.L.R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Schweg-mann Bros. v. Calvert Corp., 341 U.S. 384, 394, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); Pan American World Airways, Inc. v. C.A.B., 380 F.2d 770, 782 (2d Cir. 1967), aff'd, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968). It should be noted that this Court has already given weight to Representative Goodell's views concerning the Equal Pay Act. *See* Hodgson v. Robert Hall Clothes, Inc., 473 F.2d 589, 595 (3d Cir. 1973).

26. 384 F.2d 348, 353 (3d Cir. 1967), cert. denied, 390 U.S. 1040, 88 S.Ct. 1633, 20 L.Ed.2d 302 (1968).

tor McClellan and Rep. Elliott should be looked to as representing the true spirit of Section 102."

We conclude, then, that time of day worked is a "working condition" within the meaning of the Equal Pay Act and not merely a "factor other than sex" to be used by an employer as a matter of defense.[27]

Therefore, in the circumstances of this case, the statute is inapplicable. Because of this conclusion, we need not and do not decide Corning's other contentions, urged to support affirmance of the district court's judgment.[28]

## IV.

Recognizing that the pursuit of intent and meaning in the words of congressional committees and individual legislators may seem to some like exploring a quagmire or, perhaps, fathoming a mirage, we have been cautious against injecting whatever notions of public policy we might have into the interstices of the Equal Pay Act. Congress was careful not to make the equal pay provisions a "Bali Hai," inviting either the Secretary of Labor or the courts to substitute their judgment for that of employers or to judge the merits of job systems. Rather, our task is merely to determine whether an employer has discriminated on the basis of sex by paying different wages "for equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . ."

In terms of congressional intent, we cannot say that the district court erred

in concluding that "a given job performed [by some at night and others during the day] is not performed under similar working conditions even though all other conditions are identical. Working at night is so significant a factor that the totality of the working conditions here were dissimilar; they were not 'very much alike' or 'alike in substance or essentials.' "

The judgment of the district court will be affirmed.

27. The Wage and Hour Administrator's regulations agree with the Second Circuit's treatment of time of day worked as a "factor other than sex" and not a "working condition," 29 C.F.R. §§ 800.100, 800.145. Although such administrative interpretations are entitled to some deference, we cannot pay such homage to them so as to blind ourselves to the meaning of the legislative history as we read it.

28. For example, we need not address attention to Corning's assertion that the actual

work performed by night inspectors and day inspectors is essentially unequal in terms of skill, effort, and responsibility, *see* Shultz v. Wheaton Glass Co., 421 F.2d 259 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed. 2d 64 (1970), since, as we hold, the night inspectors and the day inspectors were not working "under similar working conditions."