Lois **TUMA** and Irene **Rucki,** Plaintiffs,

v.

**AMERICAN CAN COMPANY et al.,**
**Defendants.**

Civ. A. No. 1421–70.

United States District Court,
D. New Jersey.

Feb. 28, 1974.

---

Ruth Russell Gray, Plainfield, N. J., for plaintiffs.

Carpenter, Bennett & Morrissey by Thomas L. Morrissey, William S. Jeremiah, Newark, N. J., for defendant American Can Co.

William H. Schmelling, United Steelworkers of America, Pittsburgh, Pa., for defendant Union.

OPINION

LACEY, District Judge:

Plaintiffs are females who charge defendant American Can Company (Company) with sex discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII), and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (Equal Pay Act). Plaintiffs also charge Local Union 6301 (Union) with violating Title VII and further allege a breach by the Union of its duty of fair representation.[1] Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Bazarte v. United Transportation Union, 429 F.2d 868 (3d Cir. 1970); Hubicki v. ACF Industries, Inc., 484 F. 2d 519 (3d Cir. 1973). They also allege that the Company wrongfully acquiesced in the violation of that duty. Plaintiffs seek declaratory relief, damages, attorney's fees, and costs. This Court has jurisdiction over the various claims under 42 U.S.C. § 2000e–5(f), 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331, 1337; and see also as to the "fair representation" claim, Brady v. Trans World Airlines, Inc., 401 F.2d 87, 94 (3d Cir. 1968), cert. denied International Ass'n. of Machinists v. Brady, 393 U.S. 1048, 89 S. Ct. 680, 21 L.Ed.2d 691 (1969).

A bench trial of this matter was held on February 7, 8, 13, 14 and 15, 1974. My findings of fact and conclusions of law are hereinafter set forth. Fed.R. Civ.P. 52(a).

Plaintiffs herein are Lois Tuma (Tuma) and Irene Rucki (Rucki) who, since May 9, 1949 and April 1, 1949, respectively, have been employed at the Company's Hillside New Jersey plant, and since 1962 have been in the bargaining unit at that plant represented by the Union, as members thereof.

The Company is a New Jersey corporation engaged in an industry affecting commerce which, at its Hillside plant, manufactures metal containers primarily for beer and carbonated beverages; at all relevant times it has employed more than 25 employees for each working day

1. The defendant United Steelworkers of America, International, heretofore moved for summary judgment as to all claims against it. Said motion was granted, as was in part a similar motion by the Local Union, leaving only to be resolved as to the latter the claimed breach of duty of fair representation and the Title VII claim. See 367 F. Supp. 1178 (D.N.J.1973).

in each of 20 or more calendar weeks in the calendar year; and it is an employer within the meaning of § 701(b) of Title VII [42 U.S.C. § 2000e(b)], and within the meaning of § 2(2) [29 U.S.C. § 152(2)] of the National Labor Relations Act.

The Union is a duly chartered local of the United Steelworkers of America, AFL–CIO, which, since 1962, has been the certified collective bargaining representative of the Company's employees in the bargaining unit which includes the plaintiffs.[2] It is a labor organization within the meaning of § 701(d) and (e) of Title VII [42 U.S.C. § 2000e(d) and (e)] and within the meaning of § 2(5) [29 U.S.C. § 152(5)] of the National Labor Relations Act. At all relevant times the Union has dealt with the Company as the exclusive bargaining agent for the bargaining unit it represents.

Plaintiffs, as has been stated, commenced work at the Company's Hillside plant in 1949. Rucki was a water tester until early 1966 when she became an Inspection Assistant. Tuma, along with Christine Spadaccino, was a compound weigher. In or about 1955, because compound weighing was a type of inspection function, these two women came to be called "Inspection Assistant (formerly Compound Weigher)."[3]

Through Company-Union negotiations beginning in 1965, in early 1966 the Company ceased to list jobs as female and male jobs, and opened various "common" jobs, including that of Inspection Assistant, to men and women; and it was at this time that Rucki became an Inspection Assistant. See Ex. P–7, referring to the fact that jobs including "Inspection Assistant" were being classified as "common" jobs "under the intent of Section 11.8 of the Basic Agreement."[4] Tuma continued in the special category of "Inspection Assistant (formerly Compound Weigher)."

2. The bargaining unit was and is designated as follows:
   All hourly rated production, maintenance, shipping employees and inspectors, excluding all salaried employees, office and clerical employees, engineers and firemen, lithograph transferrers, employees under the supervision of the Company's Metropolitan Garage, professional employees, guards, foremen and supervisors.

3. Ex. J–4, "Local Seniority Plan by and between American Can Company . . . and . . . [the Union]," entered into pursuant to Article 11.2 of the collective bargaining agreement of October 1, 1964 (Ex. J–2), and effective April 4, 1966, contains the following "Memorandum of Understanding F Christine Spadaccino" (Tuma did not know why the special arrangement had not been similarly memorialized as to her):
   The Company and the Union mutually agree that Christine Spadaccino #5009, presently classified as an Inspection Assistant (formerly Compound Weigher) End Department, shall have super-seniority rights to this job as long as it is maintained as a full-time classification in the job structure of the Department. Because of her special situation, this employee shall not be considered eligible for any overtime assignment unless the entire department is scheduled to operate and her job shall be excluded from any determination of Inspection Assistants working in the department.

The Company reserves the right to discontinue the job if operating conditions warrant it or if Christine Spadaccino fails to satisfactorily perform the duties assigned to her.

W. J. Leser                Steve Cadena
FOR THE COMPANY       FOR THE
                                UNION

4. Sec. 11.8 reads in pertinent part as follows (Ex. J–2: Collective Bargaining Agreement between Company and Union, effective October 1, 1964):
   Seniority Roster
   The parties have heretofore agreed that Sections 11.6 and 11.7 shall be administered uniformly without discrimination between male and female employees and that there shall be no separate male and female seniority lists. It is recognized that such uniform application does not require the company to ignore the fact that such considerations as restrictions imposed by state and federal law, and the physical abilities normally associated with trade, craft, mechanical and skilled type jobs, may require limitations of job assignments.
   Because of differences in state laws and differences in job requirements and operating conditions between plant locations, a review shall be made in accordance with the provisions of the preceding paragraph by the local parties at each location to reach mutual agreement as to the practicable limitations on assignment of females

On or about June 6, 1967 the Company posted for bidding by males the job of General Inspector. At the time it was a Job Class 11 position—$3.272 hourly rate; and Inspection Assistant was a Job Class 6 position—$2.882 hourly rate. Neither plaintiff bid for it, Tuma because she was expressly satisfied to hold her Inspection Assistant position. Rucki may have been of the impression that it would be futile for her to bid; what is clear is that she did nothing to indicate to the Company her desire for the job. Certain women did bid (which Tuma and Rucki knew); however, none was accepted or appointed from that list, or permitted to take the test.

In September 1967 the Company "cut back" on (the Company's usage) or "eliminated" (the plaintiffs' characterization) the Inspection Assistants; and the plaintiffs were forced into the next lower paying Job Class. The work being done by plaintiffs was absorbed by General Inspectors who added such work to their other duties.

■ Plaintiffs contend that by this action the Company discriminated against them on the basis of sex. The Company just as persistently contends that the September 1967 action resulted from a seasonal business decline and that both male and female Inspection Assistants were similarly affected by the "cut back." I find that the evidence is supportive of the Company's position and that such seasonal "cut backs" occurred from time to time without regard to sex. Indeed, in September 1967 all Inspection Assistants were "cut back," including a Mr. Bernstein (holding the job temporarily) and such males as served in the third shift, a shift on which females did not work because of New Jersey work restriction statutes hereinafter described.

■ The plaintiffs protested the Company's action to their Union. Plaintiffs charge that the Union then acted in bad faith and in breach of its duty of fair representation because it did not put into the collective bargaining agreement's grievance procedures their complaint that they had been improperly cut back from their Inspection Assistant jobs and their further claim that they were entitled to be placed into General Inspector positions then and there, in September 1967. I find that plaintiffs have not proved the breach of fair representation claim.

Joseph Vicinio, a Union grievance committeeman, to whom plaintiffs' complaint was presented, investigated it and decided it was without merit. I accept and credit his testimony that his determination was founded upon the conclusion that, under the collective bargaining agreement, as well as recognized and established past practices, the Company's decision to "cut back" a particular job was under the circumstances a management prerogative. As to the demand regarding immediate placement as General Inspectors (and not even General Inspector trainees), Mr. Vicinio and the Union were obviously entitled to conclude that employees could become such only when, as, and if the Company opened the position by posting the job for bids. Even then, other hurdles had to be surmounted. From among employees signing a bid sheet the Company was entitled to select the most senior employees having the ability and work record warranting promotion. Moreover, entrance into the 3,000-hour General Inspector trainee program required passing a test. Next, there were no openings as General Inspector in September 1967. Finally, as I shall subsequently delineate, the skill, effort and responsibility required of Inspection Assistants fell far short of that required of General Inspectors.

I find that the Union refusal to utilize the grievance machinery in connection with plaintiffs' complaint was not because they are women, and that in investigating and processing the plaintiffs' complaint, the Union acted without hostility, discrimination or arbitrariness,

which are appropriate or necessary at that location. The parties shall have 90

calendar days from the signing of this agreement to complete their joint study.

and exercised its discretion in complete good faith.

I further find that after Mr. Vicinio informed the plaintiffs·their complaint would not be grieved, he advised them that if they were not satisfied with the decision, they could take an appeal through the internal union procedure, to the grievance committee as a whole, by addressing a writing to the chairman of that committee and thereafter, if still dissatisfied, to the executive board of the Union, and then to the Union membership. Plaintiffs did pursue the first two courses; and the written responses of the Union grievance committee and executive board, respectively, were as follows:

October 13, 1967

TO: Lois Tuma and Irene Rucki

In reply to your letter dated SEPT. 29, 1967, and received by me on OCT. 4, 1967. In our investigation we find that there is no grievance. An assistant inspector is there to supplement the General Inspector, and this is past procedure for the last ten years. If you feel you would like to appeal this further write the Executive Board and state your case.

JAMES P. RYAN

GRIEVANCE CHAIRMAN

and

Nov. 7, 1967

Sister Lois Tuma
Local 6301
United Steelworkers of America
Hillside, New Jersey

Dear Sister Tuma:

In reply to your appeal to the Executive Board of this Local of action taken by the Grievance Committee of this Local in your behalf please be advised that the Executive Board has voted to uphold the Grievance Committee on this matter.

In our investigation of this matter we find that the Assistant Inspector classification was formulated by the Company to supplement the General Inspector classification, and when a cut-back is deemed necessary by the company, the Assistant Inspector are the first to be cut-back in our Inspection Department.

This practice has been the procedure for the last ten (10) years in our Inspection Department. So therefore we find no basis for a grievance in your behalf. Please be advised that if you would like to carry this matter further your next course of action would be to appeal this Board's decision to our membership at our plant meetings.

If you care to do this please inform me of this in writing so I can properly include your appeal on the Agenda for that plant meeting.

Fraternally yours,

John J. Clark
Recording Secretary
Local 6301        USA

Plaintiffs did not appeal the executive board's decision to the Union membership.

I credit Mr. Vicinio's testimony that it was customary for the Union to refuse to initiate grievances which its representatives in good faith believed were without merit.

In this regard, of some historical significance is the fact that in 1960, a male employee, Artie Adams, had complained about a seasonal roll back of Inspection Assistants, contending that, as an Inspection Assistant with more plant seniority than some General Inspector trainees, he should not have been cut back from his Inspection Assistant position and that he should have been permitted to "bump" into the General Inspector classification. The Union had then refused to initiate a grievance on his behalf, for the same reasons that underlay its refusal to do so for plaintiffs in September 1967, that is, it considered such a grievance meritless.

Actually, events reflect good faith on the Union's part insofar as its female membership is concerned. Thus, in collective bargaining negotiations with the Company at the Hillside plant level, in September or October 1967, among other demands by the Union was one that the Company open the third shift on all Company jobs to female employees.[5] In November 1968 when, as shall be detailed below, the Company opened up the General Inspector post to women, Rucki, because of her poor attendance record, would not have permitted to take the test (which she failed) had not the Union interceded on her behalf. In addition, Mr. Vicinio sat as an observer with Rucki and the other job applicants who were tested. Seven applicants, including 4 females, passed the test and entered the General Inspector training program at that time.

The "fair representation" doctrine which plaintiffs invoke was created and shaped by the Supreme Court in a series of cases involving alleged racial discrimination by unions certified as exclusive representatives under the Railway Labor Act, Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944), and was thereafter extended to the unions certified under the National Labor Relations Act in Ford Motor Company v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1952); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); and Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); and see Reid v. Auto Workers, Local 1093, 479 F.2d 517, 520 (10th Cir. 1973), cert. denied, 414 U.S. 1076, 94 S. Ct. 592, 38 L.Ed.2d 483 (1973); Lewis v. Magna America Corp., 472 F.2d 560 (6th Cir. 1972); Gainey v. Railway Clerks, 313 F.2d 318, 323 (3d Cir. 1963). See also, cases cited in Davidson v. International Union, etc., 332 F.Supp. 375 (D.N.J.1971); cf. Motor Coach Employees v. Lockridge, 403 U.S. 274, 299, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

As stated by the Supreme Court in Vaca v. Sipes, supra, 386 U.S. at 177, 87 S.Ct. at 910:

. . . [T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. . . .

In applying the doctrine of the duty of fair representation, however, a union does not have to process every grievance brought to its attention or even every grievance which has merit. Thus, the Court of Appeals for this Circuit has stated [Bazarte v. United Transportation Union, 429 F.2d 868, 872 (3d Cir. 1970)]:

. . . This doctrine, however, does not confer on an employee an absolute

---

5. The import of this will emerge at a subsequent point when I discuss the Company's third-shift policy as it related to female employees.

right to force his collective bargaining agent to press his complaint all the way to the very end of the grievance procedures made possible by the collective bargaining agreement. The union has an obligation in exercising its power as bargaining agent to act fairly under the collective bargaining agreement and not to assert or press grievances which it believes in good faith do not warrant such action. An employee, therefore, is subject to the union's discretionary power to settle or even to abandon a grievance, so long as it does not act arbitrarily, and this is true even if it can later be demonstrated that the employee's claim was meritorious. It is therefore essential to plaintiff's claim that there should have been proof of "arbitrary or bad-faith conduct on the part of the Union in processing his grievance." It follows from that proof that the union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation. [footnotes omitted].

Thus, even to prove that plaintiffs' complaint, which the Union refused to grieve, was meritorious under the collective bargaining agreement, would not be enough to establish the breach of duty of fair representation claim.

Under the circumstances, the Union acted quite properly in refusing even to commence the grievance procedure. There is no real distinction between a union's refusal to take to arbitration a grievance which has been processed through grievance procedure, Vaca v. Sipes, *supra;* a union's settlement of a grievance in one of the steps of the grievance procedure, Humphrey v. Moore, *supra;* and a union's refusal to initiate a grievance, Figueroa de Arroyo et al. v. Sindicato de Trabajadores Packinghouse, AFL–CIO et al., 425 F.2d 281 (1st Cir. 1970), cert. denied, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114; rehearing denied, 400 U.S. 953, 91 S.Ct. 232, 27 L.Ed.2d 260 (1970). Thus in the latter case the court stated (425 F.2d 281 at 284, n. 2):

> While *Vaca* dealt with a union's refusal to take a processed grievance to arbitration, we see no reason to differentiate between the step of arbitration and earlier steps in the grievance procedure. The same principle applies: when the contract gives the union exclusive control over a grievance, the union must have that control in order for the whole process to function smoothly and effectively, which logic surely applies to all stages of the grievance procedure. *See* Comment, 17 Buffalo L.Rev. 165, 176–177 (1967).

In short, there is no basis for the Vaca v. Sipes claim made against the Union; the Union, it is clear, was no less active in behalf of its female membership than on behalf of its males.[6]

■ Accordingly, I find for the Union on the breach of fair representation claim founded, as I have stated, upon the Union's refusal to process the grievance plaintiffs proposed in September 1967.[7] Plaintiffs have failed to prove their charge.[8] Johnson v. General Drivers, etc., 488 F.2d 250 (6th Cir. 1973).

6. After the Union refused to grieve plaintiffs' complaint, Rucki filed a charge against the Union alleging it had failed to represent Tuma and her properly. It is undisputed that the charge was ultimately withdrawn by Rucki. What is less clear is why it was withdrawn. After a careful analysis of the relevant testimony and documentation, I find that NLRB representatives investigated the charge and found it without merit. I further find that Rucki withdrew the charge without coercion being exerted upon her by the Union. It must be emphasized that my findings on plaintiffs' charges against the Union in this suit are not based upon the filing of the charge with the NLRB, its determination, or the disposition of the charge.

7. An alternative ground for denying plaintiffs' claim rests upon Brady v. Trans World Airlines, Inc., 401 F.2d 87 (3d Cir. 1968), cert. denied, International Ass'n. of Machinists v. Brady, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969), in that plaintiffs failed to allege or prove exhaustion of their internal union remedies. *See also,* Harris v. Int'l. Longshoremen's Ass'n., 321 F.2d 801 (3d Cir. 1963).

8. Plaintiff's endeavors at trial, and in their post-trial memorandum, to broaden the base

On September 14, 1967 plaintiffs filed their Charge of Discrimination under Title VII of the Civil Rights Act of 1964, with the Equal Employment Opportunity Commission (EEOC), alleging sex discrimination as follows: [9]

*Tuma:*

7. On Tuesday, September 12, 1967 I was cutback from Assistant Inspector to High Pressure Tester. I have been with American Can Company since May, 1949. In 1951 until September 12, 1967 I was employed as an Assistant Inspector at a salary of $115.26. The job of Assistant Inspector was abolished, and the category is now called General Inspector which is considered a male job at $125.00 a week or more. Twelve (12) men are now in training for the job now called General Inspector. My job as high pressure tester pays $106.08.

I want to be placed in the General Inspector classification in accordance with my seniority, the back pay and all the benefits that are entitled to me. My union has not represented me properly in this situation.

*Rucki:*

7. On Monday, September 11, 1967 I was cutback from Assistant Inspector to Utility. I have been with American Can Company about 18½ years. In 1965 I began work as Assistant Inspector at a salary of 115.26. This job was abolished on Monday, September 11, 1967. Twelve men are in training for the job of General Inspector at a salary of $125.00 a week or more. I want to be placed on the General Inspector classification according to senior (sic), the pay and all benefits. The job I was cutback to pays $106.08 (Utility).[10]

*See* Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

---

of their *Vaca* claim not only are untimely, but substantively fail. Thus plaintiffs suggest that the Union must bear blame for an asserted violation of plaintiffs' rights by reason of the incorporation in the collective bargaining agreement of job date seniority provisions applicable to employees in mechanical classifications, including General Inspectors. *See* Ex. J–4, pp. 10–14, of Local Seniority Plan. These provisions, I find, were established by the Company and an earlier Union in the 1950's, and applied without discrimination to males and females. *Cf.* Ford Motor Company v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1952). Moreover, this contention was not raised by plaintiffs in any conversation with or submission to the Union's representatives in September 1967. Indeed, even if I were to have found that plaintiffs should prevail on this issue, the question of appropriate relief would be difficult to resolve. Plaintiffs' job seniority dates would have to be exchanged for plant seniority dates as would have to be done with innumerable others. *Cf.* O'Brien v. Weelock, 184 U.S. 450, 22 S. Ct. 354, 46 L.Ed. 636 (1902). Nor did plaintiffs prove their charge that the Union "caused" the Company to discriminate against the plaintiffs in violation of § 703(c) of the Civil Rights Act of 1964 [42 U.S.C. § 2000e–2(c)]. The reasons justifying the Union's refusal have been hereinabove set forth. *See also* EEOC Report (Ex. P–6);

N.J.S.A. 34:2–24 et seq.; and note particularly that only an employer could seek a waiver under 34:2–28 which prohibited the employment of women between midnight and 7 a. m. *Cf.* Rosenfeld v. Southern Pac. Co., 293 F.Supp. 1219, 1229 (C.D.Cal.1968), aff'd., 444 F.2d 1219 (9th Cir. 1971). Also, as already noted, the Union engaged in collective bargaining with the Company on the subject of obtaining such a waiver; and in December 1967 the Company applied for such a waiver.

9. The charges filed with the EEOC by plaintiffs on September 14, 1967, make no reference to the medical and attendance record of the plaintiffs. Likewise, they do not refer to there being no women in "mechanical type" jobs, or claim that the apprenticeship programs maintained by the Company and the Union are discriminatory. *See also*, n. 15, *infra.*

10. The EEOC Final Investigative Report was dated November 20, 1967, and service of the charges was reflected as having been made on the Company on November 9, 1967, and on the Union on November 11, 1967. EEOC's decision was dated March 28, 1969. Efforts at conciliation were unsuccessful; and on September 22, 1970, the EEOC issued a notice to the plaintiffs of their right to institute a civil action within 30 days. The Complaint herein was filed within time on October 21, 1970. *See* Alexander v.

The Company's response is, as I have indicated, that the Inspection Assistant position was not "abolished"; that there had been a "cut back" in jobs because of a seasonal decline; that the work being done by the Inspection Assistants was absorbed by General Inspectors (with their other work); and that the job classification still exists and has been reactiviated at the Hillside plant when the needs of the plant require. The Company distinguishes the Inspection Assistant position from that of General Inspector on the grounds already set forth (pp. 222–223, *supra*), and by stating that Inspection Assistants handle only a limited number of routine phases of inspection, that the position was and is used to provide adequate coverage and flexibility for the Company's inspection program, and that the duties, responsibilities and compensation for the position of Inspection Assistants were and are markedly different from those of General Inspectors.[11]

As related to their Equal Pay Act claim, plaintiffs contend that the jobs of Inspection Assistant and General Inspector are similar, within the statutory definition, in that they called for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . . "[12] They argue that as Inspection Assistants they were entitled to be paid the same as General Inspectors; and that the Company's failure to do so constituted discrimination based on sex.

■ The spirit behind the Equal Pay Act legislation was set out in Schultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir. 1970), cert. denied, 398 U.S.

---

Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

11. In September 1967, when plaintiffs filed their charges with the EEOC, Inspection Assistant was Job Class 6 and General Inspector was Job Class 11; the change to Job Class 7 and 12, respectively, resulted from the collective bargaining agreement effective February 1, 1968.

The job descriptions for the classifications of General Inspector and Inspection Assistant appear in the collective bargaining agreement between the Company and the International Union, dated October 1, 1964 and the collective bargaining agreement dated February 1, 1968 as follows:

General Inspector—Perform any or all types of inspection as assigned within the factory, under the overall general supervision of the supervisor of quality control. Be responsible for and perform all required visual, gauge and instrument inspection of materials, goods in process and finished products. Conduct any other required tests, special inspections, checks, etc. Analyze results of inspections. Take necessary action such as making holdouts of defective cans, recommending disposition of questionable product, etc. Complete any necessary reports.

Inspection Assistant—Under the overall general supervision of the supervisor of quality control perform any specifically assigned checks, tests, gauge and instrument inspections where results are compared with numerical or fixed standards and findings are reported to designated inspection or operating personnel who will make any analysis and take necessary action. May inspect visually for the more obvious defects. Complete necessary reports. Will not make any decisions as to holdouts, disposition of product, etc.

12. The Equal Pay Act of 1963 [29 U.S.C. § 206(d)(1)], prohibits sex-based wage discrimination between employees performing equal work under similar conditions and reads in pertinent part as follows:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970):

> The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.

*See also,* Brennan v. Corning Glass Works, 480 F.2d 1254 (3d Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3322 (U.S. Oct. 26, 1973) (No. 73–695). Essentially the question to be resolved here is whether the jobs involve equal work, "the performance of which requires equal skill, effort, and responsibility" and are performed under similar working conditions. 29 U.S.C. § 206(d)(1). *See* Hodgson v. Robert Hall Clothes, Inc., 473 F.2d 589 (3d Cir. 1972), cert. denied 414 U.S. 866, 94 S.Ct. 50, 38 L. Ed.2d 85 (1973). As to the standards and regulations applicable to determining if working conditions are similar, *see* Hodgson v. Miller Brewing Co., 457 F.2d 221 (7th Cir. 1972). Moreover, the jobs involved need not be identical in every respect. It is enough that they be of the same or closely related character. Inconsequential differences can be disregarded as long as the jobs are "substantially equal." Shultz v. Wheaton Glass Co., *supra,* 421 F.2d at 265.

Plaintiffs have failed to prove their Equal Pay Act claim. For the reasons hereinabove set forth, I cannot accept the plaintiffs' testimony that their work as Inspection Assistants was similar to that of General Inspector. *See* Job Descriptions; the requirements of 3,000 hour training;[13] and Appendix D to the collective bargaining agreements. Of course, the mere existence of a training plan may not be enough to escape the Equal Pay requirements (Hodgson v. Behrens Drug Co., 475 F.2d 1041 (5th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973); and the controlling factor under the Equal Pay Act is not job description but job content. *Id.,* 1049–1050, n. 12, citing 29 C.F.R. § 800.121 (1970). Marshalling all the facts, however, the conclusion is inescapable that the jobs of General Inspector and Inspection Assistant were and are vastly different, justifying different pay rates.[14]

Turning now to the Title VII claim asserted by plaintiffs against the Company, and resuming the recitation of events, on December 18, 1967 the Company applied to the Wage and Hour Bureau, Department of Labor and Industry of New Jersey, for a nightwork permit which would allow the Company to employ females on the midnight to 7:00 a. m. shift; and the permit issued on March 15, 1968. The Company thereafter opened all jobs at the Hillside plant to women.

After June 6, 1967, the next General Inspector opening did not occur until November 1968. On November 19, 1968 the Company posted a bid sheet for the job, opened to females and males alike. Rucki signed for herself and Tuma. Rucki was at first barred from the test because of a poor attendance record; but because of the Union's intercession

13. *See* 29 C.F.R. § 800.148, Interpretive Bulletin relating to "training programs." ". . . Training programs which appear to be available only to employees of one sex will, however, be carefully examined to determine whether [they] . . . are bona fide. . . ." Thus a training plan must have "substance and significance . . . ." Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1048 (5th Cir. 1973).
Administrative interpretations are entitled to deference. Skidmore v. Swift & Co., 323 U. S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). I find here that the training program did have "substance and significance." Not to be overlooked is that in 1964, and earlier, when only men were Inspection Assistants, the collective bargaining process had generated the job descriptions referred to, the 5-step pay differences, and the General Inspector test and training program.

14. Plaintiffs, it is noted, do not complain that they, as female Inspection Assistants, were paid less than male Inspection Assistants were, or would be paid, for the same work.

on her behalf, the Company allowed her to take it. She did not pass. Tuma did not take the test. Absent from work for reasons of health from October 1968 to March 1969, she either was unable or unwilling to take it. I reject the notion she attempted to project at trial, that because the Company did not send her a telegram she did not know the test was being given. She knew, I find, that Rucki had signed her name and that a test was being given, and I further find that Tuma, who impressed me as a most intelligent person, was well aware of the fact that other women were taking the test. She was ambulatory as late as November 1968 (she went to New York in that month to visit the EEOC) but made no effort to contact either the Company or the Union to ascertain whether she would be admitted to the examination.

Four of the seven vacancies for the position of General Inspector in November 1968 were filled by women. The fact that Tuma and Rucki were not awarded the job was unrelated to their sex.

In April 1970 General Inspector vacancies arose once more. Tuma and Rucki bid for the job, Tuma passed the examination and was placed in the position effective April 20, 1970, and Rucki failed a second time.

In June 1970, when General Inspector vacancies arose again, Rucki again bid for the job, took the test, and this time passed it.

Both plaintiffs have continued to date to work as General Inspectors.

Plaintiffs rely heavily upon the EEOC Decision of March 28, 1969 in their attempt to prove that portion of their Title VII charge against the Company that they were barred from the post of General Inspector because of their sex. The Decision was admitted into evidence (*see* Ex. P–6); however, both sides find fault with numerous facts and conclusions embodied in it.[15]

---

15. EEOC explicitly found that, contrary to the one phase of plaintiffs' claim, the Inspection Assistant job was not eliminated in September 1967 and that a male was cut back with them from the Inspection Assistant post, as follows:

> \*    \*    \*    \*    \*
>
> The job of Assistant Inspector was not eliminated. The Company records indicate that Charging Parties Tuma and Rucki along with a male Assistant Inspector were cut back on the first shift. Because of their seniority, the Charging Parties had the right to bump the Assistant Inspectors on the second shift. They chose not to go on the second shift and therefore were rolled back to a lower job classification when the peak manufacturing period ended. There is no evidence of discrimination with ·regard to this charge.
>
> \*    \*    \*    \*    \*
>
> *No reasonable cause exists to believe that the Respondent Employer has committed unlawful employment practices by eliminating Charging Parties' Tuma and Rucki's jobs of Assistant Inspector on the basis of their sex (female).*

The Company of course agrees with this conclusion, the plaintiffs do not. As to plaintiffs' claim that Title VII was violated by the Company's barring females from the General Inspector job, the parties switch their positions: plaintiffs agree with the Commission, the Company disagrees.

The Commission is not the final arbiter of plaintiffs' grievances; that function lies solely with this court. Fekete v. U. S. Steel Corp., 424 F.2d 331, 336 (3d Cir. 1970). *See also* Jurinko v. Edwin L. Wiegand Co., 477 F.2d 1038, 1040 n. 3 (3d Cir. 1973). Similarly, it is noted that the Circuits are not in accord on the question of whether the admission of these reports is mandated, Smith v. Universal Services, Inc., 454 F.2d 154, 156–158 (5th Cir. 1972), or within the sound discretion of the trial court. Moss v. Lane Co., Inc., 471 F.2d 853, 856 (4th Cir. 1973); Cox v. Babcock & Wilcox Co., 471 F.2d 13, 15 (4th Cir. 1972); Heard v. Mueller Co., 464 F.2d 190, 194 (6th Cir. 1972).

While I admitted the EEOC materials as evidence, I made it clear that the weight to be accorded them was of course a matter I would have to decide as trier of the facts. *Cf.* Smith v. Universal Services, Inc., *supra*, 454 F.2d at 157. Because of the sharp differences taken by the parties with the Report and Decision, I have accorded them little weight. The fact that the grievance and arbitration procedures are not resorted to does not bar an action such as this. When an employee asserts rights derived from a federal statute, "the presumption of comprehensiveness of the arbitral remedy is . . . rebutted." United States Bulk Carrier v. Arguelles, 400 U.S. 351, 362, 91 S.Ct. 409, 415, 27 L.Ed.2d 456 (1971); Phillips v. Carborundum Company, 361 F.Supp. 1016, 1020

Plaintiffs' Title VII claim actually is in two parts. That they were eliminated as Inspection Assistants because of their sex is unsupported by the evidence. I explicitly find that the job was "cut back" because of a seasonal decline and all Inspection Assistants were "cut back," including a male on the first shift, and males on the third shift.

The other phase of plaintiffs' Title VII claim is not as readily resolved. It is of course conceded by the Company that the General Inspector job had been barred to females in June 1967 when it was posted for bidding.[16] The plaintiffs, however, had done nothing affirmative of any convincing nature to persuade me that they themselves suffered injury by that policy. Their case would be different had they bid for the job in June 1967 as certain women did, and then been barred from taking the test.[17] As a matter of fact, as already stated (p. 222, *supra*), I find it affirmatively established that Tuma was satisfied to retain her job as an Assistant

Inspector. The record is not as clear as to Rucki; but on the evidence, taken as a whole, I can only conclude that she too did nothing to indicate that she wanted to be considered for promotion to General Inspector. Thus, although the Company cannot absolve itself from a Title VII violation by falling back upon state statutes protective of women, and EEOC interpretations of them, Kober v. Westinghouse Electric Corp., 480 F.2d 240, 246 (3d Cir. 1973), I find no impact upon plaintiffs stemming from this illegal policy.[18]

Nor did the Company automatically have to open up General Inspector jobs in September 1967 to the plaintiffs and place them in such posts when they had theretofore evinced no interest in the posts and there existed at that time no vacancies.[19]

In *Kober, supra,* a female plaintiff had been denied her request for an "automatic" promotion for which she was admittedly qualified because of her sex. There was in the instant matter nothing

(W.D.N.Y.1973). *Cf.* Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

16. The Company did not employ females as General Inspector at the Hillside plant in September 1967 because the New Jersey female labor laws in effect at that time prohibited the employment of women for more than 10 hours in any one day or more than 6 days or 54 hours in any one week and from midnight to 7:00 a. m. N.J.S.A. 34:2–24; N.J.S.A. 34:2–28.

The seasonal nature of the production work at the Company's Hillside plant required all General Inspectors to work from time to time for more than 10 hours in any one day or more than six days or 54 hours in any one week. During the peak season in 1967 (approximately May to September) virtually all of the General Inspectors worked over 12 hours a day and 54 hours per week during a substantial number of weeks. The job also required working during the hours of midnight to 7:00 a. m. on the third shift.

17. On the other hand, if this had been the wrongful act by which plaintiffs had been injured, then the EEOC Complaint would be out of time unless the violation were deemed a continuing one. *Cf.* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 36 L.Ed.2d 668 (1973).

18. Two other females, Waschek and McGee, had in fact bid for the General Inspec-

tor job in June 1967 but their names were stricken from the list. Their cases are not before the Court.

The Company's reliance upon 42 U.S.C. § 2000e–12(b) is misplaced except to the extent that the issue of damages is affected thereby. *See* the opinion of the District Court in *Kober,* 325 F.Supp. 467, 471 (E.D. Pa.1971). The Company's reference to the EEOC December 2, 1965 Guideline omits mention of certain important material. *See Kober,* 325 F.Supp. 467, 469.

*Kober* provides (480 F.2d at 246):

We conclude that it is now the law that discrimination based on reliance on conflicting state statutes is an intentional unfair employment practice. Intentional unfair employment practices are those engaged in deliberately and not accidentally. No wilfullness on the part of the employer need be shown to establish a violation of Section 706(g).

As will hereinafter be noted, the *Kober* trial court had denied back pay. 325 F.Supp. 467, 473–474. The Court of Appeals found this no abuse of discretion.

19. Even in September 1967 plaintiffs did not make a direct application to the Company for the General Inspector job. Such as the Company got came by way of its receipt of the EEOC charge which was served upon it on or about November 9, 1967.

"automatic" in becoming a General Inspector. A test had to be taken and passed and, as I have already described, Tuma was not to take one until April 1970 when she passed and was made a General Inspector trainee. Rucki took tests in November 1968 and April 1970 before she took and passed the test given in June 1970.[20] Even to be allowed to take the test required a good work record; and except for Union intervention in November 1968, Rucki's absenteeism would have led to her being barred from the test.

Under all the circumstances, I hold that plaintiffs have not sustained their burden of proving that *they* were discriminated against because of their sex.

This opinion might well end here. However, because of the possibility of appellate review, and for reasons of judicial economy, I shall make further findings.

Even if it should be ultimately determined by an appellate tribunal that plaintiffs did in fact prove their cause of action alleging a Title VII violation, I expressly find that this is not an appropriate case for back pay or damages. In addition to what I find was a good faith reliance by the Company upon New Jersey's female labor laws and EEOC's less than clear interpretations, the Company had had, as early as February 1, 1967, the intelligence conveyed by its conciliation agreement with the EEOC on a prior charge of sex discrimination. This agreement took cognizance of female protective state laws, as follows:

All employees have an equal opportunity to bid for a job vacancy except for those jobs in which basic occupational qualifications and/or state law restricts them from performing.

While it is true that the Company could have applied for a nightwork exemption prior to December 1967, it is just as true that no exemption could be obtained from the prohibition of employing women in excess of 10 hours in any one day or 54 hours or 6 days in any one week. These latter prohibitions presented a particular hardship in the case of females in that General Inspectors were, in peak seasons, usually required to work not only during the midnight shift but also more than 10 hours a day and 54 hours or 6 days in a week.

I further note that having applied for a nightwork exemption in December 1967, which was received in March 1968, the Company at once opened all jobs to females, even though it was not until 1971 that New Jersey statutes were repealed.

By the time the Complaint herein was filed, in October 1970, both plaintiffs had been accepted as General Inspector trainees, Tuma in April and Rucki in June 1970. Indeed both could have been in the program two years before—when other females were taken in—if they had been qualified and had passed the test given in November 1968.

Under facts far less compelling in an employer's favor, District Judge Weber had denied back pay in Kober v. Westinghouse Electric Corp., *supra*. On appeal the Court of Appeals stated (480 F.2d 240 at 248):

. . . We find no abuse of discretion here, as state statutes, like federal ones, are entitled to a presumption of constitutionality until their invalidity is judicially determined. Davies Warehouse Co. v. Bowles, 321 U.S. 144, 153, 64 S.Ct. 474, 88 L.Ed. 635 (1944); Manning, [v. General Motors. Corp.] *supra*, 466 F.2d [812] at 816. Westinghouse did not have the benefit of any judicial or even quasi-judicial determination of the validity of the Pennsylvania statutes until the opinion of the Attorney General on November 14, 1969 and the lower court opinion in this case on March 29, 1971. Furthermore, Miss Kober was promoted to the first available vacancy in April of 1970, after the EEOC finally made a determinative ruling on

---

20. *Cf.* Cooper and Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598 (1969).

the validity of conflicting state statutes on August 19, 1969 and after the Attorney General of the Commonwealth of Pennsylvania concluded on November 14, 1969 that the female protective provisions were implicitly repealed by the adoption of the amendment to the Pennsylvania Human Relations Act of July 9, 1969, 43 P.S. § 951 et seq. We certainly cannot find any abuse of discretion by the lower court. . . .

Accordingly, I would not award damages or back pay even if I were to find plaintiffs had proved their Title VII claim.[21]

An appropriate form of Judgment, in favor of the defendants and against plaintiffs, should be submitted. If consent as to form is unobtainable, settle the form thereof on five days notice. No costs.[22]

21. Moreover, a decision to award back pay would not be easy of fulfillment. In view of the many uncertainties attendant upon plaintiffs becoming General Inspectors, as of what date would back pay be awarded?

22. The Company's motion to strike paras. 7(e) and 7(f) of the Complaint is granted to the extent it is not made moot by this determination.

Count II of plaintiffs' Complaint falls in view of my determination on the claim asserted against the Union.