Dianne **PELTIER** et al., Plaintiffs,

v.

**CITY OF FARGO,** a Municipal Corpo-
ration, et al., Defendants.

Civ. No. A3-74-78.

United States District Court,
D. North Dakota,
Southeastern Division.

June 25, 1975.

Robert A. Feder, Fargo, N. D., for plaintiffs.

Wayne O. Solberg, City Atty., Solberg & Stewart, Fargo, N. D., for defendants.

## MEMORANDUM OF DECISION AND ORDER

BENSON, Chief Judge.

Plaintiffs bring this action claiming unlawful sex discrimination in the employment practices of the Fargo Police Department, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 206(d) et seq. (hereinafter the Equal Pay Act), the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983, and seek injunctive relief, compensatory damages, costs and attorney's fees.

Plaintiffs are female employees of the City of Fargo Police Department in the position of "car markers". Defendants, except for Oliver Thomas, are the City of Fargo, North Dakota, a municipal corporation, and named individual officers, employees and agents of the City. The word "Defendants" as used in this opinion will relate to the City of Fargo. The car marker classification was new to the City's employee list when created in the spring of 1973, and was established at the lowest pay range on the City pay scale, equal to that of Clerk-Typist I. According to the defendants, such a position was created to improve the efficiency of the Police Department by releasing fully trained and qualified patrol officers from devoting time to parking control duties. The City contacted the North Dakota State Employment Service regarding potential applicants for the position. Inquiry was made of the City whether women working under the "Win" (Women In Need) program would be acceptable candidates for this position. It was also explained to the City that hiring under the guidelines of the "WIN" program might entitle the City of Fargo to federal financial assistance. Having no objections, Personnel Director Kenneth L. Gaare, proceeded to interview and hire individuals referred by the North Dakota State Employment Service. Dianne Peltier began work on April 5, 1973, shortly after the program began. Connie Wolter began on August 9, 1973, and Sally Suby on December 10, 1973. All three women were hired at pay range 7.

At the time the position of car marker was created and became effective, the patrol officers who had previously been riding three wheeled motorcycles were no longer utilized for parking control duties. From that time, only employees with the job classification of "car marker" were assigned duties connected with parking control, which included utilization of enclosed three wheeled vehicles for marking cars. No males have or are serving in the position of "car marker". It is plaintiffs' contention that they perform the same duties as had been performed by males who marked cars prior to the creation of the "car marker" category. The males, during their carmarking duty, were classified as patrol officers, and possessed the qualifications of patrol officers, for which they received appropriate wages. At present, a patrolman makes approximately twice that of the scale 7 salary received by the plaintiffs. This the plaintiffs allege to be a violation of the Fair Labor Standards Act, 29 U.S.C. § 206(d) as amended.

In their position as patrol officers, the male car markers were eligible for promotion and transfer just as any other department personnel. By department standards, the plaintiffs did not qualify as patrol officers. They nonetheless contend they are entitled to "the same opportunities with respect to promotion and transfer without surrounding stumbling blocks and barriers which violate Title VII." The reference is to the patrol officer selection process which includes a test and personal interview by the City Civil Service office. Plaintiffs

have never applied for the position of patrol officer. They respond to that omission by saying:

"Defendants claim that a 'reasonable effort' must be shown by Plaintiffs in order to sustain a charge of discrimination. Presumably, Defendants mean the Plaintiffs must apply in writing specifically for patrol officer. That simply is not the law. MacDonald, supra; U. S. v. Local 86, Iron Workers, 315 F.Supp. 1202 (D.W.Wash.1970); Herrera v. Yellow Freight Systems, Inc., 505 F.2d 66 (5th Cir. 1974); and Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974) and cases cited therein. Even if it were not the case, what would Defendants have Plaintiffs do? Go through the chicanery of applying for a job in person and 'formally', and then be rejected by the Defendants who rely on their own non-validated tests, their totally subjective oral interviews and their prejudices?"

The car marker classification has, according to the plaintiffs, limited, segregated and classified female employees so as to deprive them of equal employment opportunities because of their sex, in violation of 42 U.S.C. § 2000e–2(a)(2).

Plaintiffs further allege that weight and height requirements of the police department violate the Fourteenth Amendment and 42 U.S.C. § 1983. They also object to the defendants utilizing as a precondition for employment, tests which have not been validated in accordance with Equal Employment Opportunity Commission regulations.

In addition, the plaintiffs have alleged the following as discriminatory employment practices.

A. The failure or refusal of the defendants to hire females as law enforcement officers on the same basis as males have been hired.

B. The failure or refusal of the defendants to take affirmative action to cure past as well as present employment discrimination policies.

C. The restriction of plaintiffs' duties ordered on July 30, 1974, by Police Chief Anderson. This is alleged to be a retaliation to the plaintiffs' action in this case, and thereby a violation of Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 2000e–3(a).

D. The disbursement of funds by the North Dakota Combined Law Enforcement Council to a law enforcement agency which is in violation of the funding agency's own regulations.

The plaintiffs brought the action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure as a class action. In a memorandum and order issued March 19, 1975, this Court concluded the action was not properly maintainable as a class action, and limited the trial to the alleged grievances of the named plaintiffs.

### JURISDICTION

Plaintiffs initially filed charges with the Equal Employment Opportunity Commission on July 1, 1974. The instant action was filed September 3, 1974, pursuant to 42 U.S.C. § 2000e–5(f)(1) after right to sue notices were issued to the plaintiffs on August 30, 1974. Defendants admit jurisdiction under 42 U.S.C. § 2000e et seq., as well as 29 U.S.C. § 201 et seq., as amended; however, specifically deny that this Court has jurisdiction under 28 U.S.C. § 1343(3), (4) and under 42 U.S.C. § 1983, as alleged by plaintiffs. It is not clear to the Court why it would not have jurisdiction under § 1983 or § 1343. It is apparent defendants' objection goes to the substance of the claims alleged under these sections, rather than the Court's power to accept jurisdiction, and shall be treated as such. The complaint is sufficient on its face to set out a claim under 42 U.S.C. § 1983, and thereby confers jurisdiction under 28 U.S.C. § 1343.

*EQUAL PAY*

## Standard

There are presently only three individuals classified as "car markers", and they are the three female plaintiffs. They represent the only persons ever to fill that catgeory. Pertaining to the alleged Equal Pay Act violation, the plaintiffs do not demand they be made patrol officers. Their prayer for relief is confusing. In their Reply Brief, their claim is stated in this manner.

> "To set the record straight, and hopefully the Defendants, Plaintiffs herewith state that they have never demanded that they be immediately made patrol officers. Plaintiffs have always maintained, and still maintain, that they have performed the same duties as male car markers, who happened to be classified as 'patrolmen' for pay and promotion purposes, and Plaintiffs insist upon their right to receive the same compensation and be given the same opportunities with respect to promotion and transfer without surmounting stumbling blocks and barriers which violate Title VII. This case is about present female car markers and past male car markers. Females should not be treated differently than male car markers just because they are females."

The complaint reads:

> "These discriminatory employment practices include but are not limited to:
>
> A. Hiring females to do substantially the work performed by males for a salary of approximately one-half ($\frac{1}{2}$) that given to males."

It is plaintiffs' intention to compare the work performed by the three named plaintiffs to males who performed car marking duties prior to the creation of the "carmarker" category. Further the wage comparison is to be made between present individuals classified as patrol officers and these three plaintiffs. As the plaintiffs put it, the case is about present carmarkers and past male car-markers. Comparison is to be made between the "skill, effort, and responsibility" required of the female carmarkers and that which was required of male officers who performed carmarking duties prior to the spring of 1973.

One of the first issues encountered is whether § 206(d) requires the jobs being compared be performed simultaneously. The answer is quite clear in 29 CFR 800.114C, that not only do they not have to be performed simultaneously, such a construction would be contrary to equal pay requirements.

"EQUALITY OF PAY

§ 800.114 'Male jobs' and 'female jobs' generally.

. . .

(c) That the Equal Pay Act was intended to encompass situations of this kind is confirmed by the declared purposes and terms of the Act as well as by the legislative history. The statute is intended to eliminate sex as a basis for wage differentials between employees performing equal work on jobs within the establishment, and if the rates paid for the same jobs are lower when occupants of the jobs are of one sex than they are when the jobs are filled by employees of the opposite sex, such discrimination within the establishment is equally in violation of the statutory prohibition whether or not employees of both sexes are employed in such jobs at the same time. Accordingly, *where an employee of one sex is hired or assigned to a particular job to replace an employee of the opposite sex, comparison of the newly assigned employee's wage rate with that of the replaced former employee is required for purposes of section 6(d)(1), whether or not the job is performed concurrently by employees of both sexes.* For example, if a particular job which in the past has been performed by a male employee becomes vacant and is then filled by a female employee, it would be contrary to the equal pay requirement to pay

the female employee a lower wage rate than was paid for the same job when performed by the male employee, even though employees of both sexes may not be performing the job at the same time. Payment of the lower wage rate in such circumstances is a prohibited wage differential. The same principle is involved if all employees of one sex are removed from a particular job (by transfer or discharge) so as to retain employees of only one sex in a job previously performed interchangeably or concurrently by employees of both sexes. If a prohibited sex-based wage differential had been established or maintained in violation of the Act when the same job was being performed by employees of both sexes, the employer's obligation to pay the higher rate for the job cannot be avoided or evaded by the device of confining the job to members of the lower paid sex. Compliance with the Act in such circumstances can be achieved only by increasing the wage rate to the higher rate paid for the job when performed by employees of the opposite sex." (Emphasis added).

The Equal Pay Act specifically prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . ." [1]

### Burden

■ The plaintiffs argue that they perform the same duties as males did who previously performed car marking duties and that the job requires equal skill, effort, and responsibility, and are performed under similar working conditions as was the former male car markers' job. In such a case, the plaintiff must carry the burden of proving by a preponderance of evidence that this is true. *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Brennan v. Corning Glass Works*, 480 F.2d 1254, 1258 (3rd Cir. 1973); *Hodgson v. Corning Glass Works*, 474 F.2d 226, 231 (2nd Cir. 1973); *Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 722 (5th Cir. 1970); *Shultz v. American Can Company-Dixie Products*, 424 F.2d 356, 360 (8th Cir. 1970); *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 266 (3rd Cir. 1970), *cert. denied* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

The spirit behind the Equal Pay Act legislation was set out in *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3rd Cir. 1970), *cert. denied* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

" * * * Congress in prescribing 'equal' work did not require that the jobs be identical, but only that they must be substantially equal. Any other interpretation would destroy the remedial purposes of the Act.

'The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome

---

1. 29 U.S.C. § 206(d):

"(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.'"

The term "equal" as used in 29 U.S.C. § 206(d)(1) does not mean identical. *See, Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256, 1258 (5th Cir. 1972), "a substantial identity of job functions"; *Hodgson v. Miller Brewing Company,* 457 F.2d 221, 227 (7th Cir. 1972), "equal pay standard . . . depends . . . on actual job requirements and performances"; *Shultz v. American Can Company-Dixie Products,* 424 F.2d 356, 360 (8th Cir. 1970) "substantially equal"; *Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 265 (3rd Cir. 1970); 29 C.F.R. 800.120, 800.-122, 800.127.

In *Brookhaven,* the standard was succinctly explained:

"As the doctrine is emerging, jobs do not entail equal efforts [and skill and responsibilities] even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort [skill and responsibility], (2) consume a significant amount of time for all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential." 436 F.2d at 725.

▮ It is also clear that Congress did not intend to apply the equal pay standard to jobs substantially differing in terms and conditions. 29 C.F.R. § 800.-120. In *Hodgson v. American Bank of Commerce,* 447 F.2d 416 (5th Cir. 1971), the court held that where a male employee was engaged in both bookkeeping and drive in teller duties, a comparison between him and other female bookkeepers or female tellers was improper in an attempt to prove a violation of the Equal Pay Act.

▮ As used in the Act "skill" would include consideration of such factors as experience, training, education and ability. 29 C.F.R. § 800.125. If an employee must have essentially the same skill in order to perform either of two jobs, the jobs will qualify under the Act as jobs the performance of which requires equal skill. *Brennan v. Corning Glass Works,* 480 F.2d 1254, 1259 (3rd Cir. 1973), citing remarks of Congressman Goodell who sponsored the Equal Pay Act, 109 Cong.Rec. 9209 (1963). "Effort" would denote the physically exerting activities which are required in the performance of the position. 29 C.F.R. § 800.127. Where there is no substantial difference in the amount or degree of effort which is necessary to perform the jobs under comparison, there is equal effort even though the effort may be exerted in different ways on the two jobs. A difference in the kind of effort required thus will not justify a wage differentiation. *Schultz v. American Can Company-Dixie Products,* 424 F.2d 356, 360–361 (8th Cir. 1970); *Hodgson v. Brookhaven General Hospital,* 436 F. 2d 719, 725 (5th Cir. 1970). The term "responsibilities" concerns the degree of accountability required in the performance of the job. 29 C.F.R. §§ 800.129, 800.130. An example might be where one employee of a group performing jobs which are equal in other respects from time to time assumes supervisory duties for reasons such as the absence of the normal supervisor. It would be justifiable in this instance to pay a higher wage to this individual with the understanding he is to act as a "relief" supervisor when needed.

And finally, 29 C.F.R. § 800.121 declares:

"Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance. For example, the fact that jobs performed by male and female employees may have the same total point value under an evaluation system in use by the employer does not in itself mean that the jobs concerned are

equal, according to the terms of the statute."

The above quoted portion of 29 CFR § 800.121 calls for each job to be examined on its own merits.

When discussing the facts relating to the plaintiffs' equal pay claim, it is important to focus on the language of the plaintiffs' brief, supra, that plaintiffs have never demanded that they be made patrol officers, but maintain they perform the same duty as male car markers who happen to be classified as patrolmen for pay and promotion purposes.

A dispute arose as to the duties of the female car markers from the creation of the category. The evidence is clear that the plaintiffs' primary responsibility was to patrol the downtown streets to check for overtime parking and other non-moving traffic violations and the issuance of traffic tickets. They were to perform their duties while riding in an enclosed three wheeled vehicle. In reality, other tasks were performed by the female car markers, among which were traffic control for funerals, parades, delivering postage meters to the post office, delivering bicycle licenses to outlets around the city, returning stolen property to owners, assisting paint crews in their duties by diverting traffic. In an order by the Chief of Police, passed down on July 30, 1974, the car markers were specifically restricted to their carmarking duties as enumerated on the car marker classification job description. The Court nonetheless takes into consideration the extra duties performed by the plaintiffs prior to July 30, 1974, in its comparison.

Regarding the similarity of working conditions, from the evidence, the Court finds:

1. The patrol officers who performed carmarking duties prior to the spring of 1973, did so while riding open three wheeled Harley-Davidson motorcycles. In performance of their duties, plaintiffs were furnished enclosed three wheeled Cushman or Otis motor vehicles. Because of the enclosed cabs, these vehicles were not considered by law a motorcycle, and occupants are not required to wear helmets.

2. Male patrol officers who had previously been engaged in marking cars possessed the skills and training of a police patrol officer. The testimony and exhibits indicate that the officers riding the motorcycles received training in police procedure and handling of weapons and equipment. They were further instructed as to arrest techniques, traffic citation procedures and general police conduct. All patrol officers were at some time assigned to and completed the Police Academy Training Course in Bismarck, North Dakota. Each officer also participated in various police school courses during their tenure on the three wheel vehicles. The training of these officers paralleled that of any other officer on the force. The plaintiffs, although fully qualified educationally to become police officers,[2] had only about one-half hour of instruction on the operation of the motor vehicle before their duty on the streets began. Thereafter, training came in the form of "tips and pointers into the esoterics of their job" from their superiors. Plaintiff Peltier apparently did view several movies on the proper methods of controlling traffic and making arrests, and was instructed by her superior on the proper method of making courtroom appearances. She also had occasion to visit a courtroom with her superior. This appears to be the extent of police training received by the plaintiffs.

3. Male officers who performed the carmarking duties were trained to fill in any patrol officer position on the police force. Transfers occurred regularly from carmarking duty. Each officer was subject to call. Possession of the skill of a police officer was necessary to the requirements of the job prior to the spring of 1973. The male car marker represented the downtown security. It

---

2. All possessed high school degrees or higher.

was necessary that they be capable of handling any situation which the possession of skills necessary for the performance of a job is distinguishable from possession of the same skills although not necessary for the position. There were extra duties which the male officers were charged with and those duties did require more training than that necessary for marking cars. See 29 CFR 800.125, 800.126. Those extra duties were, according to the evidence,

 a. Answering calls and complaints relating to fights, fires, automobile accidents, thefts, and other misdemeanors and felonies.

 b. Assisting patrol car units in the investigation of crimes.

 c. Interviewed various citizens lodging complaints and took appropriate enforcement or reporting action or directed persons to proper authorities.

 d. Issued moving traffic violation tickets.

 e. Performed general patrol work in the downtown sector of the City of Fargo.

 f. Rode along river banks, wooded areas and railroad grades, searching for drownings, missing persons, transients and intoxicated individuals.

 g. Were fully armed to act in any situation which would require the use of force. Their training included instruction on the use of firearms.

 h. Were subject to call at nights, weekends or any free time. They were transferred on the basis of need to other departments or assignments such as patrol in patrol cars, detective bureau, traffic bureau and radio room.

4. The efforts expended by the plaintiffs were only those necessary to mark cars, to issue traffic tickets and, on occasion, report matters observed to police headquarters. The effort required of male officers performing the job of car marker included that necessary not only to mark cars, but to break up fights, make arrests, assist with accidents, answer burglary alarms, bomb and fire alarms, work in all kinds of weather, work extra shifts and rotate into different departments when other branches of the Police Department might require additional help.

5. Prior to the creation of the car marker job classification, car marking was one of the many different work assignments to which a patrol officer could expect to be assigned. Car marking without other duties did not require the skill and training necessarily possessed by a patrol officer and the effect of the creation of the car marker position was to relieve personnel trained and qualified as patrol officers from duties that could be performed by one who didn't possess the skill of a patrol officer. There is no evidence that the car marker position was limited to females.

6. When considering these facts together, the skill, responsibility and effort of the male car markers was significantly different from that required of the plaintiffs in performance of their duty.

▮ The Court concludes the plaintiffs have failed to sustain their burden to prove that the jobs performed by female car markers are equal in skill, effort and responsibility to those of male officers performing car marking duties prior to the spring of 1973.

*TITLE VII*

Plaintiffs next direct the Court's attention to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Section 2000e–2(a)(2) declares it to be an unlawful employment practice for an employer "to limit, segregate, or classify his employees [in such a] way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's . . . sex. . . ."

*Standing*

■ Very simply, the plaintiffs are women who allege injury in fact by virtue of the defendant's alleged discriminatory employment practices. Based on the facts of the present case, plaintiffs' allegation will be sufficient to confer standing. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Assoc. of Data Processing Service Organization v. Camp,* 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (1970). The fact that none of the plaintiffs have in fact applied for the position of patrol officer does not prevent their challenge of the practices. It is their contention that those very practices deterred application.

*Burden*

The crucial question in the plaintiffs' Title VII allegation is related to the burden which a party must carry in order to prove discrimination. Specifically, what is that burden, how is it satisfied, and at what point does it shift to the defendant?

■ In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court indicated the proper order and nature of proof in actions under Title VII of the Civil Rights Act of 1964. The plaintiff must carry the burden of establishing a prima facie case of discrimination. Thereafter, the burden would shift to the employer to explain the action alleged to be discriminatory. Such a rationale is applicable to sex discrimination as well as race.

> "Although McDonnell Douglas dealt with a claim of racial discrimination, the Court has indicated that the same considerations would apply to a sex discrimination complaint under Title VII. *Edwin L. Wiegard Co. v. Jurinko,* 414 U.S. 970 [94 S.Ct. 293, 38 L. Ed.2d 214], vacating mem., 477 F.2d 1038 (3rd Cir. 1973)." *Holthaus v. Compton & Sons, Inc.,* 514 F.2d 651, filed April 10, 1975 (8th Cir.).

By *McDonnell Douglas* standards, the complainant can establish a prima facie case of discrimination by showing:

> "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants, (iii) that despite his qualifications he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824.

The Supreme Court did, however, point out in a footnote to the above cited passage, that the facts and incidents of the prima facie case may vary:

> "The facts necessarily will vary in Title VII cases, and the specifications above [referring to the specification enumerated above] of the prima facie proof required from [the complainant in this case] is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802, n. 13, 93 S.Ct. at 1824.

What the Supreme Court seems to say and what the ordinary case bears out, the typical employment discrimination case would encompass the situation where the plaintiff actually applied for a job and was rejected, due to unlawful sex discrimination. *See e. g. Commonwealth of Pennsylvania v. Glickman,* 370 F.Supp. 724 (D.Pa.1974); *Smith v. City of East Cleveland,* 363 F.Supp. 1131 (D. Ohio 1973); *Fowler v. Schwarzwalder,* 351 F.Supp. 721 (D.Minn.1972). The plaintiffs did not apply for positions as police officers. They nonetheless contend that such an act is not necessary and that a prima facie case of discrimination has been proven. Their contention rests on two grounds, first the exercise of application and rejection would be one of futility; such an act would merely subject themselves to the very discriminatory practices it is claimed exist. And second, statistical information presented in the case was sufficient to

establish a prima facie case of discrimination obviating the need for formal application.

Taking first the "futility" argument. The following cases illustrate how specifications of employment discrimination can and do vary.

(a) *Hailes v. United States Air Lines,* 464 F.2d 1006, 1009 (5th Cir. 1972). In that case, the plaintiff, a male, charged sex discrimination in the hiring of stewardesses and flight attendants. Plaintiff had not even applied for a job, but the court held that a complaint of sex discrimination need not allege that the plaintiff actually applied for and was rejected for a job, but it was sufficient to allege that the practices of the defendant employer were so discriminatory as to inculcate a reasonable belief on plaintiff's part that even applying for the job was futile. (It is interesting that this court found that an airline ad for "stewardesses" placed in "Help Wanted-Female" column of the newspaper without a corresponding ad in "Help-Wanted-Male" column indicated an improper preference for females which could not be neutralized by the statement that the airline was an "Equal Opportunity Employer".)

(b) *McDonald v. General Mills, Inc.,* 387 F.Supp. 24 (D.Cal.1974). In this case, employers, through a college placement center, had expressed preference to interview and hire male students. The plaintiff, a female student, brought suit against the employers on the basis of an allegation that she was deterred from making application and interviews with the employers because of their employment practices. The Court held that it was not necessary that the female student actually apply.

"Where the defendants had indicated an express preference to interview and lure 'males' it can reasonably be assumed that plaintiff would believe application for the jobs would be a futile gesture." 387 F.Supp. at 37.

(c) *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40 (5th Cir. 1974).

This case involved employment discrimination based on race. The defendant had a company policy of not allowing transfers from city driving jobs to the more lucrative road driver jobs. Various city drivers (in this case Mexican Americans) challenged the policy. The court held that plaintiffs did not have to show that they applied for the road drivers' jobs.

"Nothing in this language is inconsistent with the accepted practice of federal courts' recognizing statistics of establishing a prima facie case of employment discrimination. Sagers v. Yellow Freight System, N.D.Ga.1973, 5 EPD ¶ 8885 at 5759. In *McDonnell Douglas* a black worker, laid off in a reduction-in-force, complained that he was not rehired because of his race and involvement in the civil rights movement. The Court emphasized that the 'critical issue . . . concerns the order and allocation of proof in a private, [*non-class-action*] challenging employment discrimination'. 411 U.S. at 800, 93 S.Ct. at 1823. (emphasis supplied). Furthermore, the Court observed in a crucial footnote that the test outlined in the text of the opinion for a prima facie case 'is not necessarily applicable in every respect to differing factual situations'. 411 U.S. at 802, n. 13, 93 S.Ct. at 1824.

The present case differs in several significant respects from *McDonnell Douglas*. First, this is a class action. Equally important, the Supreme Court noted in *McDonnell Douglas* no history of past employment discrimination or any other factor that might have discouraged the respondent from applying for a job. Indeed, he had a job with the company, and its refusal to rehire him after his layoff formed the gravamen of the complaint. In contrast, at the time of Rodriguez's complaint to the EEOC, ETMF had never hired a black or Mexican-American line driver in the Texas-Southern Conference area. Given these past

hiring practices, 'it is not unreasonable to assume that minority persons [would] . . . be reluctant to apply for employment, absent some positive assurance that if qualified, they [would] in fact be hired on a more than token basis'. Carter v. Gallagher, 8 Cir. 1972, 452 F.2d 315, 331 (en banc). *It would be unrealistic to require the plaintiffs to show that blacks and Mexican-Americans applied for road driver jobs they knew they could not obtain.* See Bing v. Roadway Express, Inc., 485 F.2d [441] at 451; Jones v. Lee Way Motor Freight, Inc., 431 F.2d [245] at 247. We note also another distinction. In *McDonnell Douglas* the respondent's qualifications were undisputed. He had held the job, and apparently served satisfactorily, before he was laid off. *In the instant case, in contrast, the possibility of meeting one of the most important criteria for hiring —the road test—has been denied to the class of city drivers. Deprived of the opportunity to take a driving test, the plaintiffs could not prove they were qualified to become road drivers.* 505 F.2d at 55. (emphasis added)

The Rodriguez case does make a special point out of the fact that there was no opportunity for the complaining party to take the test or make application.

*See also, Herrera v. Yellow Freight System, Inc.,* 505 F.2d 66 (5th Cir. 1974).

d. *Reynolds v. Wise,* 375 F.Supp. 145 (N.D.Tex.1974). In this case, the policy of the Bureau of Prisons that only males could be appointed as correctional officers in institutions for men was struck down as violative of the prohibition against sex discrimination. The plaintiff, a female employee of the Bureau of Prisons, was allowed to contest the policy although she had never made application to be a correctional officer. The defendant had the burden to show a business necessity or bona fide occupational qualification to maintain the males only policy.

Much of the plaintiffs' pretrial argument related to women presently employed by the Fargo Police Department as patrol officers. In light of the Court's ruling that the case shall not be treated as a class action, such argument will be considered only in terms of the three named plaintiffs. The Court has found that "car markers" per se are not the equivalent of patrol officers. Plaintiffs' status in the department does not elevate their position in challenging the employment practices of the Fargo Police Department. They are considered for all purposes as any other applicant for the position of patrol officer.

■ To overcome the requirement of having to prove application and rejection, the plaintiff must offer enough evidence to illustrate such an action would be futile. Each of the cases reviewed rested on a particular set of facts and represents an exception to the rule.

The testimony of all three plaintiffs, as to why each did not take the exam, was similar. All felt that they would not have a chance of becoming a police officer. Only Plaintiff Suby actually approached Chief Anderson, and based on her "impression" of the conversation, she felt that even if she took the examination, he would not hire her based on her sex. It is apparent from the testimony proffered by the plaintiffs that such feelings were subjectively dependent on rumors, which could not be substantiated.

It was also interesting from the testimony of the three plaintiffs that each expressed willingness to attend patrol school to obtain patrol status. Their objection was aimed at the selection process and testing process.

There was no evidence that any female had made application to take the patrol officer examination and had been denied the opportunity. Renee Homuth, whose testimony was offered as one woman who had applied and was rejected on the basis of her sex, revealed through questions by the Court that she could not recall even applying for any

job other than a Youth Director position. Her testimony was based on an impression that if she had applied for a police officer job, she would not receive the youth job. She could not base the impression on anything any city official said, but merely on her theory that if they were interested in having her as a police officer, they would have provided more information. She felt she was discouraged from applying.

No evidence was submitted to show the number of female applicants for the position of patrol officer.

▮ The Court finds that the plaintiffs have failed to satisfactorily explain their failure to make application for a position as a patrol officer.

The plaintiffs allege that the first time in which the defendants advertised for a police officer without regard to sex was in January of 1975. The evidence at trial supports such an allegation. However, the evidence also established that the Fargo Police Department did not advertise for police officers from the spring of 1973 to the advertisement in January of 1975. This would encompass the entire time in which the three plaintiffs were employed as car markers.

Relating to the plaintiffs' second theory in which to establish a prima facie case in a manner other than that set out in *McDonnell Douglas*, statistical evidence in Title VII cases, although not conclusive evidence, is treated by the Eighth Circuit as prima facie employment discrimination.

"Secondly, our Court has repeatedly held that statistical data may establish a prima facie case of employment discrimination. United States v. N. L. Industries, supra, 479 F.2d at 368; United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 307 (8th Cir.

1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 900, 34 L.Ed. 687 (1973); Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971), modified on rehearing en banc, 452 F.2d 327 (8th Cir.), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Marquez v. Omaha District Sales Office, Ford Division, supra [8th Cir.], 440 F.2d 1157, at 1160–1161; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); United States v. Sheet Metal Workers Local 36, 416 F.2d 123, 127 n. 7 (8th Cir. 1969)." *Gilmore v. Kansas City Terminal Railway Co.*, 509 F.2d 48, 52 (8th Cir. 1975).

The Court must look to the evidence presented by the plaintiffs, which would establish statistical unbalance in hiring. The only basic statistic presented was that out of 53,365 residents of the City of Fargo, 51.2% were women, according to 1970 figures issued by the Department of Commerce. There are only three women employed as police officers in the City of Fargo, a small percentage of the total force.[3]

▮ As a matter of law, these statistics are sufficient to establish a prima facie case of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). *See Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 426 (8th Cir. 1970).

▮ Such a finding allows the plaintiffs, as individuals, to challenge employment practices which they allege are discriminatory towards them. In a case in which a class alleges discriminatory employment practices, the Eighth Circuit has dictated a complete examination of general employment practices. Such an examination is merited in the present

---

3. In *Rodgers v. International Paper Company*, 510 F.2d 1340 (8th Cir. 1975), the Eighth Circuit found "by means of the statistic that only one black has been hired for a supervisory position, the plaintiffs have made a prima facie showing of racial dis-

crimination by I.P. in its employee selection policies for supervisory personnel." 510 F. 2d at 1344. The Court therein set out various standards which the district court was to apply to evidence taken in an employment discrimination case.

case, despite the fact that no class was found to exist.

"Initially, we examine the class action contention that appellee has pursued a policy of employment discrimination against blacks in general. Discrimination, or conversely fairness, in general hiring practices often indicates whether an employer has discriminated against a particular applicant for employment. Furthermore, a single charge of employment discrimination under Title VII found by the EEOC to rest upon reasonable grounds may serve to launch a full-scale inquiry into the alleged unlawful motivation in employment practices. Jenkins v. United Gas Corporation, 400 F.2d 28, 33 (5th Cir. 1968). In examining a claim for relief under Title VII, a court's inquiry must focus upon those employment practices which gave rise to the particular complaint. The crucial issue in a lawsuit of this kind is whether the plaintiff establishes hiring bias at the time of his rejection for employment and subsequent complaint to the EEOC, not the employment practices utilized two years later. See United States v. International Brotherhood of Electrical Workers, Local 38, 428 F.2d 144 (6th Cir. 1970); Jenkins, supra, 400 F.2d 28; United States v. Plumbers Local 73, 314 F.Supp. 160 (S.D.Ind.1969). Title VII of the Civil Rights Act of 1964 is to be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination. United States v. Medical Society of South Carolina, 298 F.Supp. 145 (D.S.C.1969)." Parham v. Southwestern Bell Telephone Co., 433 F.2d at 425.

The burden of proof now rests with the defendant to rebut the inference that sex considerations have influenced employment choices. Gilmore v. Kansas City Terminal Ry., 509 F.2d 48, 52 (8th Cir. 1975). On the statistic that the Fargo Police Department employs only three women police officers, and never has there been a female patrol officer, the plaintiffs have made a prima facie showing of sex discrimination by the City of Fargo in its employee selection process.

The Eighth Circuit has recently set out standards for the district court to follow when evaluating evidence offered to prove or disprove discriminatory employment practices. Rogers v. International Paper Co., 510 F.2d 1340 (8th Cir. 1975). What follows is an examination of these standards in relation to the evidence presented in this case. Particularly as it pertains to the three named plaintiffs.

*Current Discrimination*

In order for the Court to consider granting any injunctive relief or other equitable relief, it must find that the employer "has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint . . . ." 42 U.S.C. 2000e–5(g).

"Proof of intent. Notwithstanding the provision in Title VII allowing injunctive relief and back pay only where the respondent has intentionally engaged in unlawful practice, 42 U.S.C. § 2000e–5(g), courts have established that proof of discrimination does not require proof of intent to discriminate. All that is required is that the employment practice not be accidental. See, e. g., Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 996 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). The Supreme Court has adopted this interpretation. In Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), the Court stated that 'Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation.' See also United States v. N. L. Industries, 479 F.2d 354, 361 (8th Cir. 1973) (and cases cited therein)." Rogers v. Interna-

tional Paper Co., 510 F.2d at 1343–1344.

The defendants have offered no evidence to show the practices alleged to be discriminatory were accidental. Upon the Court's finding of a prima facie case of discrimination in light of statistical information, the employer has the burden of disproving intent. Without evidence to the contrary, the Court finds the employment practices intentional.

The Court must next examine the patterns, practices and general employment practices of the City of Fargo to determine whether alleged acts of overt discrimination existed.

"Overt discrimination may be demonstrated by the production of qualified minority applicants for past vacancies who were rejected for a less qualified white person. If such employer conduct is established, a deliberate purpose to discriminate may be inferred and close judicial scrutiny of employment practices is warranted. In Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1382 (4th Cir. 1972), the court observed:

Courts have often observed that proof of overt racial discrimination in employment is seldom direct. Recognizing this, we have found 'error in limiting Title VII to present specific acts of racial discrimination,' and it is now well established that courts must also examine statistics, patterns, practices and general policies to ascertain whether racial discrimination exists. (citations omitted)." *Rogers v. International Paper Co.*, 510 F.2d at 1345.

None of the named plaintiffs have demonstrated that they were qualified as police officers, made applications, or were rejected because of their sex only to have the position filled by a male applicant. As a matter of fact, no qualified women applicants who were rejected for less qualified males were produced. No evidence was offered to show practices, patterns or general policies of the defendants which would create sex

discrimination. The only statistic the Court can consider is that no women have ever been patrol officers and only three are presently classified as "police officers".

"Such a showing of disparity between an employer's work force and the population in the relevant market area has been held sufficient to shift the burden to the employer to rebut the inference that racial considerations have dictated employment choices. United States v. N. L. Industries, supra, 479 F.2d at 369; Marquez v. Omaha District Sales Office, Ford Division, supra, 440 F.2d at 1162; Carter v. Gallagher, supra, 452 F.2d at 323. Statistical evidence, however, is not sufficient as a matter of law to establish a violation of Title VII, as in Parham v. Southwestern Bell Telephone Co., supra, 433 F.2d at 426, when the defense of lack of qualified minority applicants is interposed by the employer. In that event, however, 'Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.' Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971).

It is then open to the plaintiffs to demonstrate a violation of Title VII on either of two independent bases; that the employment policies reflect present discriminatory conduct or that current policies, though neutral on their face, carry forward vestiges of past discrimination. This represents the traditional dual focus in civil rights litigation upon purpose, as well as effect. Discrimination resulting from either commands relief. That assessment should be guided by the principles set forth in Rogers v. International Paper Co., No. 74–1086, 510 F.2d 1340 at 1355 (8th Cir., 1975)." *Gilmore v. Kansas City Terminal Railway Company*, 509 F.2d at 52.

The defendants do contend that no female, including the plaintiffs, has ever

solicited employment as a patrol officer with the City by submission of a formal application. This defense shifts the burden back to the plaintiffs for proof of overt discrimination. They have presented none.

 The plaintiffs are entitled to an equal opportunity to qualify and become police officers. However, plaintiffs are not entitled to automatic employment in that classification, without ever making application. Under the facts of this case, a claim for back pay alleged under 42 U.S.C. § 2000e et seq., is without merit.

The Court turns next to the recruitment efforts of the defendant.

"Evidence of discrimination by design might also be based upon a history of minimal recruitment efforts in publicizing vacancies and openings in supervisory and management positions. The passive nature of past recruitment together with the failure to undertake affirmative recruitment efforts after the passage of Title VII may justify a finding of discriminatory conduct. United States v. N. L. Industries, supra, 479 F.2d at 368; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426–427 (8th Cir. 1970); United States v. Sheet Metal Workers Local 36, 416 F.2d 123, 139–140 (8th Cir. 1969)." *Rogers v. International Paper Company*, 510 F.2d at 1345.

Relating to these efforts, each employer must comply with EEOC guidelines pertaining to affirmative action programs.

"1607.14 Affirmative action.

Nothing in these guidelines shall be interpreted as diminishing a person's obligation under both Title VII and Executive Order 11246 as amended by Executive Order 11375 to undertake affirmative action to ensure that applicants or employees are treated without regard to race, color, religion,

sex, or national origin. Specifically, the use of tests which have been validated pursuant to these guidelines does not relieve employers, unions or employment agencies of their obligations to take positive action in affording employment and training to members of classes protected by Title VII." 29 CFR 1607.14.

In addition, the City of Fargo, as a recipient of Law Enforcement Assistance Administration funds, must conform to the organization's equal opportunity regulations. They are found at 28 CFR, Chapter 1, Part 42. Specifically, 28 CFR 42.303 requires that those who receive LEAA funds must prepare an analysis of all minority and women employees within the department showing in detail the opportunities available to them through promotion, transfers, and hiring.

Further, 28 CFR 42.304 requires each recipient have an equal employment opportunity in writing which would include the prerequisites found in subsections (a) through (g) of that section.

The only plan ever adopted by the defendants was done so after the commencement of this lawsuit.[4] On its face, it is insufficient, and it has not been approved by EEOC. It nonetheless is the only formal attempt to comply with EEOC and LEAA guidelines. This fact serves to illustrate the passive nature of the City recruitment practices. Proof of other recruitment practices was not offered by the defendants, who hold the burden of proving compliance with this aspect of 42 U.S.C. § 2000e et seq.

Since commencement of this suit, a more detailed program is purportedly in the making, nonetheless "[w]hile an employer's more recent employment practices may bear upon the remedy sought, they do not affect the determination of whether the employer previously violated Title VII". *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d at 426.

4. See Appendix—Minutes of Meeting of City Commission held on May 21, 1974 and September 17, 1974.

The next employment selection criteria to be scrutinized is the employer's objective test program.

"Where objective criteria are employed the EEOC guidelines on Employment Selection Procedures, 29 C. F.R. §§ 1607 et seq., cited with approval by the Court in Griggs, supra, 401 U.S. at 434, 91 S.Ct. 849, as expressing the will of Congress, control. They require generally that empirical evidence must demonstrate a significant correlation between the test employed and important elements of work behavior." *Rogers v. International Paper Company*, 510 F.2d at 1345.

The City of Fargo's employment policy begins with an advertisement in the local newspaper for a police officer. Until January of 1975, by the defendants' own admission, these advertisements were for "policemen", specifically requesting male applicants. They were, at the time this suit was commenced, in violation of 29 CFR 1604.5.

"§ 1604.5 Job opportunities advertising.

It is a violation of title VII for a help-wanted advertisement to indicate a preference, limitation, specification, or discrimination based on sex unless sex is a bona fide occupational qualification for the particular job involved. The placement of an advertisement in columns classified by publishers on the basis of sex, such as columns headed 'Male' or 'Female', will be considered an expression of a preference, limitation, specification, or discrimination based on sex." See also 42 U. S.C. § 2000e–3(b).

In addition to the successful completion of a civil service test, the applicant was to be of a prescribed height and weight.[5] The imposition of this height-weight requirement is the basis of the Plaintiffs' 42 U.S.C. § 1983 action and alleged Fourteenth Amendment violation.

These requirements must be examined in the context of the prevailing policy toward hiring women. No women have been patrol officers in the City of Fargo; only three are classified presently as police officers. These factors are relevant in determining whether the height and weight requirements discriminate on the basis of sex. *See generally, Smith v. City of East Cleveland*, 363 F. Supp. 1131 (D.Ohio 1973); *Harper v. Mayor & City Council*, 359 F.Supp. 1187 (D.Md.1973). Based on effect alone, the Court concludes that they discriminate on the basis of sex.

In this case, the question is whether the height and weight requirement are rationally related to the job performance as Fargo Police Officer. *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). In this regard, the parties have stipulated that females are qualified to perform police work and funcion as patrol officers in the same manner as males.

Apparently defendants chose not to contest the validity of such requirements, and instead declare that such standards are no longer used in defendants' employment program. Both Chief Anderson and Personnel Officer Gaare gave testimony that height and weight requirements which were used by the Fargo Police Department were "immediately dropped" following receipt of the June, 1974, LEAA guidelines.

"5. REQUIREMENT

The use of minimum height requirements which disqualifies disproportionately women and persons of certain national origins and races, such as persons of Mexican and Puerto Rican ancestry, or oriental descent will be considered violative to this Department's regulations prohibiting employment discrimination."

The defendant further contends that no weight-height regulations were ever included in any city ordinance nor in

---

5. Applicant was to be a minimum of 5' 8" and of proportionate weight.

any written civil service regulation, but rather was a matter of policy.

The Court finds that any height-weight requirements, not related to job performance, whether formal or informal, are improper and violate equal opportunity guidelines.[6]

▇▇▇ An applicant must also successfully complete a civil service examination to be considered for employment as a police officer. This type of criteria must also relate to job performance.

"In analyzing the legitimacy of testing devices as prerequisites to employment, several principles are significant. In Griggs v. Duke Power Co., supra, 401 U.S. at 431, 91 S.Ct. at 853, the Supreme Court held that employment practices which '[operate] to exclude Negroes [and] cannot be shown to be related to job performance' were 'artificial, arbitrary, and unnecessary barriers to employment' and therefore were prohibited. The Court also held that 'Congress has placed on the employer the burden of showing that any given requirement [has] a manifest relationship to the employment in question.' id. at 432, 91 S.Ct. at 854, and that the EEOC guidelines on Employer Selection Procedures, 29 C.F.R. § 1607, expressed the will of Congress and were thus a measure relevant to demonstrating manifest relationship to employment. Griggs, supra, at 434, 91 S.Ct. 10. That burden, however, does not shift to the employer until the plaintiff has shown a discriminatory effect of the challenged employment requirement. Id. at 431, 91 S. Ct. 10; Gilmore v. Kansas City Terminal Ry., supra, 509 F.2d at 52–53;

United States v. Georgia Power Co., 474 F.2d 906, 912 (5th Cir. 1973); Moody v. Albermarle Paper Co., 474 F.2d 134, 138 (4th Cir. 1973); Chance v. Board of Examiners, 458 F.2d 1167, 1176 (2d Cir. 1972). Yet such a showing of discriminatory impact may be prima facie extablished by statistical data. Gilmore v. Kansas City Terminal Ry., supra, 509 F.2d at 52 (cases therein cited)." Rogers v. International Paper Company, 510 F. 2d at 1348.

The defendants admit that the test presently in use is not properly validated according to EEOC guidelines. Courts confronted with challenges to public employment examinations predicated upon the equal protection clause of the Fourteenth Amendment have generally agreed that the guidelines issued by the EEOC provide persuasive standards for evaluating claims of job-relatedness. See e. g., Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315, 320, 326, adopted. in relevant part, 452 F.2d 327 (8th Cir. 1971) (en banc), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Fowler v. Schwarzwalder, 351 F.Supp. 721 (D. Minn.1972); Pennsylvania v. O'Neill, 348 F.Supp. 1084 (E.D.Pa.1972), aff'd in relevant part, 473 F.2d 1029 (3rd Cir. 1973) (en banc); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal.1972). The Equal Employment Opportunity Guidelines on Employment testing procedures are found at 29 CFR §§ 1607.1 to 1607.-14.

▇▇▇ Nonvalidated tests and the subjective hiring practices used by an

---

6. " § 42.203 Discrimination prohibited.

No agency or office to which this subpart applies under § 42.201 shall discriminate in its employment practices against employees or applicants for employment because of race, color, creed, sex, or national origin. Nothing contained in this subpart shall be construed as requiring any such agency or office to adopt a percentage ratio, quota system, or other program to achieve racial balance or to eliminate racial imbalance. Notwithstanding any other provision of this subpart, it shall not be a discriminatory employment practice to hire or assign an individual on the basis of creed, sex, or national origin where the office or agency claiming an exception for an individual based on creed, sex, or national origin is able to demonstrate that the creed, sex, or national origin of the individual is essential to the performance of the job." 28 CFR 42.203.

employer are not per se violative of 42 U.S.C. § 2000e–2. But where they result in discrimination, the burden of producing evidence shifts to the employer to offer satisfactory justification for his procedures. Hester v. Southern Ry. Co., 497 F.2d 1374 (5th Cir. 1974).

On the defendants own admission, their employment tests have not been validated. Nor has evidence been submitted to relate the test to job performance. The defendants' general employment practices have already been determined to have resulted in prima facie discrimination. Without considering the validity of the actual test used, the Court finds the defendants in violation of EEOC regulations.

Applicants for the position of police officer must also take an oral examination, which is graded and averaged in with the written test score. Once grades have been established, applicants are ranked in accordance with test scores.[7] The three top ranked individuals are subsequently relayed to the Chief of Police, who then selects one of the three. The procedure is labeled the "rule of three".

The Eighth Circuit has commented on such subjective standards as oral interviews.

> "Greater possibilities for abuse, however, are inherent in subjective definitions of employment selection and promotion criteria. Yet they are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about hiring and promotion in supervisory and managerial jobs cannot realistically be made using objective standards alone. Thus, it is especially important for courts to be sensitive to possible bias in the hiring and promotion process arising from such subjective definition of employment criteria. The EEOC guidelines, the Executive Order program, and the courts have all established the requirement of, and in most cases a measure for, examining the subjective hiring and promotion criteria. At the very least, it is necessary to identify the goals underlying the subjective criteria through a job analysis. Examination of those goals might reveal underlying personal biases or discriminatory stereotype classifications. See, e. g., EEOC Dec. No. 72–0721 (Dec. 27, 1971), 4 FEP Cases 439 (1972). It may additionally appear that subjective preference is accorded factors which are discriminatory, as for example, education accomplishment when such is not shown to be related to job performance, a history of arrest records, a history of wage garnishment, or personal references that are nepotistic or culturally biased. If there is any evidence of a discriminatory policy, courts have in the past closely circumscribed and even rejected practices of personal interviews, supervisory recommendations, and other subjective hiring criteria." Rogers v. International Paper Company, 510 F.2d at 1345–1346.

No evidence was submitted from which the Court could determine the validity of the Police Department's subjective hiring practices.

> "29 CFR 1607.13 Other selection techniques.
>
> Selection techniques other than tests, as defined in § 1607.2, may be improperly used so as to have the effect of discriminating against minority groups. Such techniques include, but are not restricted to, unscored or casual interviews and unscored application forms. Where there are data suggesting employment discrimination, the person may be called upon to present evidence concerning the validity of his unscored procedures as well as of any tests which may be used, the evidence of validity being of the same types referred to in

---

7. Veteran's preference points are utilized in the ranking. No objection to such a policy was included in the pleadings and thus has no bearing on the decision of this Court.

§§ 1607.4 and 1607.5. Data suggesting the possibility of discrimination exists, for example, when there are differential rates of applicant rejection from various minority and nonminority or sex groups for the same job or group of jobs or when there are disproportionate representation of minority and nonminority or sex groups among present employees in different types of jobs. If the person is unable or unwilling to perform such validation studies, he has the option of adjusting employment procedures so as to eliminate the conditions suggestive of employment discrimination."

█ The Court having found discrimination and also nonvalidated tests and subjective hiring practices, the burden was on the Defendants to produce evidence of justification for its procedures. Having failed to carry that burden, the Court must conclude the Defendants are not in compliance with 29 CFR 1607.13.

## ALLEGED DISCRIMINATION FOR MAKING CHARGES

Plaintiffs have further alleged a violation of 42 U.S.C. § 2000e–3(a).

"(a) It shall be unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subcharter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

The defendants, through their agent, Captain Roscoe of the Traffic Division, instructed the plaintiffs to limit their duties solely to carmarking, in conformity with their job descriptions.[8] They were to curtail any other duties which they might be performing which did not involve carmarking functions. The order was issued on July 30, 1974. The plaintiffs allege this was done in retaliation to their challenge of defendants' employment practices.

█ The departmental order issued on July 30, 1974, limited the plaintiffs to duties specifically given to them in their job description. The Court concludes the evidence is not sufficient to support the allegation of retaliation.

## DISBURSEMENT OF LAW ENFORCEMENT FUNDS

Also alleged as a discriminatory employment practice is the distribution of funds by the North Dakota Law Enforcement Council to the Fargo Police Department which are in violation of the funding agency's own regulations.

On November 4, 1974, plaintiffs moved to enjoin all the defendants except Oliver Thomas, from seeking or receiving any funds for Police Department use from the North Dakota Law Enforcement Council, and further to enjoin the North Dakota Law Enforcement Council, through Oliver Thomas, as Acting Administrator, from receiving applications or awarding grants to the City of Fargo for Police Department use.

This Court denied that motion on January 2, 1975, wherein it stated:

"42 U.S.C. § 3757 provides an administrative proceeding for barring LEAA funds for failure of an applicant to comply with the law or regulations governing the granting of funds. Plaintiffs have chosen not to pursue this administrative remedy, and have not shown the Court that these two alleged violations of regulations have so affected the rights of the named

---

8. See Appendix, Defendants' Exhibits 33 and 34.

plaintiffs as to require the granting of an injunction, nor have they shown the Court that they would benefit from the injunction.

It is not the function of the Court to collaterally enforce the regulations of LEAA through an injunctive proceeding and in the absence of any showing that the requested injunction would accomplish the purpose of eliminating the alleged discriminatory practices, the request for oral argument and the motion for preliminary injunction are DENIED. *See Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970)."

██ Plaintiffs have to date failed to comply with the administrative remedies made available through 42 U.S.C. § 3757. The Court has no recourse but to deny any relief pending exhaustion of remedies for any alleged discrimination caused by the payment of LEAA funds.

## REMEDIAL MEASURES

Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), grants the court the power to enjoin employment practices found to be unlawful, as well as award such affirmative relief as is deemed to be appropriate. The Court has the responsibility to see that the relief ordered brings an end to discriminatory employment practices and redresses the wrongs suffered by the aggrieved claimants.

It is ordered:

1. The Court will retain jurisdiction in the matter.
2. The Defendants will adopt an affirmative action program and validated employment tests that meet the requirements of 29 CFR § 1607 and other applicable federal statutes and regulations.
3. Within a reasonable time, the Defendants will file its report with the Court to show compliance with the mandate of this Court, and upon such a showing judgment will be entered for dismissal of the action.
4. Defendants will pay plaintiffs' attorney's fees, which have been determined on the following basis.

## ATTORNEY'S FEES

Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), grants the Court, in its discretion, the power to award attorney's fees to the prevailing party.

The Fair Labor Standards Act, 29 U.S.C. § 216(b), also allows for attorney fees in a case in which judgment is awarded to the Plaintiff. The Court has denied recovery under § 206(d); therefore, any granting of attorney fees is limited accordingly.

In relation to the Plaintiffs' claim under 42 U.S.C. § 1983 and the Fourteenth Amendment, the Court's attention is drawn to a recent United States Supreme Court case, *Alyeska Pipeline Service Co. v. Wilderness Society, et al*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The court held generally that attorney fees are not ordinarily recoverable by the prevailing litigant in federal litigation in the absence of statutory authorization. In a footnote, the Court declared·

"In recent years, some lower federal courts, erroneously, we think, have employed the private attorney general approach to award attorney's fees. *See, e. g., Souza v. Travisno*, 512 F.2d 1137 (CA1 1975); *Hoitt v. Vietk*, 495 F.2d 219 (CA1 1974); *Knight v. Auciello*, 453 F.2d 852 (CA1 1972); *Cornist v. Richland Parish School Board*, 495 F.2d 189 (CA5 1974); *Fairley v. Patterson*, 493 F.2d 598 (CA5 1974); *Cooper v. Allen*, 467 F.2d 836 (CA5 1972); *Lee v. Southern Home Sites Corp.*, 444 F.2d 143 (CA5 1971); *Taylor v. Perini*, 503 F.2d 899 (CA6 1974); *Morales v. Haines*, 486 F.2d 880 (CA7 1973); *Donahue v. Staunton*, 471 F.2d 475 (CA7 1972), cert. denied 410 U.S. 955 [93 S.Ct. 1419, 35 L.Ed.2d 687] (1973); *Fowler v. Schwarzwalder*, 498 F.2d 143 (CA8 1974); *Brandenburger v. Thompson*, 494 F.2d 885 (CA9 1974); *LaRaza*

*Unida v. Volpe,* 57 F.R.D. 94 (ND Cal.1972). The Court of Appeals for the Fourth Circuit has refused to adopt the private attorney general rule. *Bradley v. School Board of the City of Richmond,* 472 F.2d 318, 327–331 vacated on other grounds, 416 U. S. 696 [94 S.Ct. 2006, 40 L.Ed.2d 476] (1974). Cf. *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,* 497 F.2d 1113 (CA2 1974).

This Court's summary affirmance of the decision in *Sims v. Amos,* 340 F. Supp. 691 (MD Ala.), aff'd 409 U.S. 942 [93 S.Ct. 290, 34 L.Ed.2d 215] (1972), cannot be taken as an acceptance of a judicially created private attorney general rule. The District Court in *Sims* indicated that there was an alternative available—the bad faith of the defendants—upon which to base the award of fees. 340 F. Supp., at 694. See also *Edelman v. Jordan,* 415 U.S. 651, 670–671 [94 S. Ct. 1347, 39 L.Ed.2d 662] (1974)." *Aleyska Pipeline Service Co. v. Wilderness Society, et al,* 95 S.Ct. at 1628, 44 L.Ed.2d at 160.

■ Under the facts of the present case, plaintiffs are not entitled to attorney fees for any part of the suit brought under 42 U.S.C. § 1983. Nonetheless, it is the finding of this Court that any proven violation of 42 U.S.C. § 1983 is also a violation of Title VII. For the purpose of determining attorney fees, the Court will consider all relief granted as being granted pursuant to 42 U.S.C. § 2000e et seq.

■ The amount of reasonable attorney's fees, which may be awarded or recovered under 42 U.S.C. § 2000e–5(k) as part of the costs in an action under Title VII, is within the discretion of the Court.[9]

Some of the factors considered by the Court in determining the amount of a reasonable attorney's fee are enumerated in the Code of Professional Responsibility, Disciplinary Rule 2–106(B).

"Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

The plaintiffs' attorney has submitted an affidavit in which he claims 282.20 hours.

9. *See e. g. Brito v. Zia Co.,* 478 F.2d 1200, 1204 (10th Cir. 1973); *Lea v. Cone Mills Corp.,* 467 F.2d 277, 280 (4th Cir. 1972); *Weeks v. Southern Bell Tel. & Tel. Co.,* 467 F.2d 95, 97 (5th Cir. 1972); *Barela v. United Nuclear Corp.,* 462 F.2d 149, 155 (10th Cir. 1972); *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002, 1008 (9th Cir. 1972); *Culpepper v. Reynolds Metal Co.,* 442 F.2d 1078, 1081 (5th Cir. 1971); *Batiste v. Furnco Constr. Corp.,* 350 F.Supp.

10 (D.C.Ill.1972); *Tidwell v. American Oil Co.,* 332 F.Supp. 424 (D.C.Utah 1971); *Rosen v. Public Service Electric & Gas Co.,* 328 F.Supp. 454, 468 (D.C.N.J.1970); *Clark v. American Marine Corp.,* 320 F. Supp. 709 (D.C.La.1970); aff'd in per curiam op. 437 F.2d 959 (5th Cir. 1971); *Utility Workers Union v. Southern California Edison Co.,* 320 F.Supp. 1262, 1267 (D.C. Cal.1970); *Richards v. Griffith Rubber Mills,* 300 F.Supp. 338, 341 (D.C.Or.1969).

Based on the facts of this case, a consideration of the factors listed in Disciplinary Rule 2–106(B) and the extent of relief granted by the Court under 42 U.S.C. § 2000e et seq., attorney's fees in the amount of Two Thousand Five Hundred and no/Dollars ($2,500.-00) is reasonable, and is hereby awarded. Costs which can specifically be related to the relief granted under 42 U.S.C. § 2000e et seq., are also awarded.

## APPENDIX

*Minutes of City Commission Meeting, May 21, 1974.*

*"Request of the Personnel Officer that the Board Adopt and Approve an Affirmative Action Plan for All Departments to Comply With Received and Filed:*

Commissioner Schuster read a communication from Kenneth L. Gaare, Personnel Officer, stating it is necessary for the City Commission to adopt and approve the following Affirmative Action Plan for all departments to comply with in order to fully comply with the Federal Equal Opportunity Act of 1972 and in every instance of application of a government grant this plan must be attached:

### 'FARGO AFFIRMATIVE ACTION PLAN

Each government segment in the state must now comply with the Equal Opportunity Act for 1972 and as such must devise an affirmative action plan for that government unit, in order to comply with federal regulations the following shall be if approved by the City Commission the affirmative action program for the City of Fargo:

a) Equal opportunity posters will be posted in close proximity to where persons apply for jobs.

b) A resolution of support will be adopted by the City Commission.

c) All advertising for jobs will be screened by the Personnel Department to see that they are non-discriminating, prior to submission.

d) We will provide a seminar with mandatory attendance by supervisory personnel in the city.

e) A review of our present job descriptions will be conducted and re-written as needed, with the goal being to eliminate all unnecessary references to race, creed, color or sex.

f) Our current job application forms will be revised to see that only questions pertinent to the job are asked.

g) Our holiday policies will be revised to insure no religious preferences are shown.

h) That all contracts between the City and private employers will contain a statement of compliance with the E.E.O. program and see that it is complied with.

i) That all promotional tests be reviewed for validation before administering same and that they are appropriate to the performance of the job.

j) To be able to advise persons wishing to file a claim of discrimination where to send claim and offer necessary assistance.

k) To complete the necessary reporting under the act promptly and retain official copy.

l) That the annual performance reports on employees be made realistic and pertinent to the job.'

Commissioner Schuster moved the communication along with the attached reprint of Chapter 60 US Department Labor Equal Opportunity Employment be received and filed for consideration at a later date.

Second by Stockman.

Commissioner Schuster questioned if any methodology has been set up to carry out this Plan. For instance, he said, item (1) which deals with annual performance reports on employees being made realistic and pertinent to the job should be implemented since the present

system is anything but realistic or pertinent in some cases. Also, he said, at the present time, many of the job descriptions are very discriminatory against women and would have to be rewritten.

All the Commissioners voted aye and the motion was declared carried."

*Minutes of City Commission Meeting, September 17, 1974.*

*"Amended Affirmative Action Program from the Personnel Office for the City of Fargo Approved:*

The Board received a communication from Kenneth L. Gaare, Personnel Officer, submitting the following amended Affirmative Action Program to the one submitted May 21, 1974 for the City of Fargo:

1. To achieve a productive Affirmative Action Program that will develop positive changes throughout the City of Fargo personnel system.

2. To avoid sanctions imposed by federal, state or local regulatory agencies.

3. To minimize individual complaints of discrimination within city employment.

4. To develop a city wide policy with the ability to respond quickly and effectively to changing federal, state and local requirements.

5. To establish and maintain an effective and positive Equal Opportunity image and posture to the public and to the enforcement agencies.

6. To achieve the above with a maximum of integrity and effort consistent with existing and changing management philosophies.

Statement of policy for an Affirmative Action Program to be adopted by the City Commission:

'The Board of City Commissioners, City of Fargo, North Dakota, desires that every person be given full and equal opportunity for employment, training and promotion within the city and the community from whom the city purchases goods and services. To that end the Board of City Commissioners will establish from this point on an Affirmative Action Program and Policy. That no individual shall be discriminated against with respect to compensation terms, conditions or other privileges of employment because of race, color, religion, sex, national origin or age. However, nothing contained in this policy shall be construed to repeal or modify any federal, state or local law creating special rights or preference for veterans.'

Commissioner Bromenschenkel moved the communication along with the attached amended Affirmative Action Program from Mr. Gaare be received and filed and approved.

Second by Pedersen.

Commissioner Schuster stated he will not vote against this motion to approve this but the specifics of the Plan should be discussed prior to their implementation. He said with the changes that will be necessary on applications, oral tests, etc. to conform with State and Federal laws the Civil Service structure will need a great deal of changing and possibly the Civil Service Commission should be increased to either five or seven members. He said, if the Civil Service Commission is increased to five members, two of them should be women; and if it is increased to seven members, three of them should be women. He suggested that one or two City employees also be on that Board. Commissioner Schuster stated that he feels when discrimination cases are considered, the City should also consider that it has been somewhat discriminatory against applicants forty years of age or more.

Mr. Gaare was recognized and stated that implementation of an Affirmative

Action Program and changing applications to conform with present laws in most states has been a very time-consuming and costly item. He said two men have offered their assistance to the City in this regard free of charge because the City of Fargo is a Member of the League of Cities. In answer to a question, Mr. Gaare stated that these objectives and plans for the Affirmative Action Program are very general and he will be presenting all specific items to the Board for their consideration.

Mrs. Lois Altenburg stated she is representing the Fargo Branch of the North Dakota Coalition of the Status of Women and has not had an opportunity to review this Program. She requested that this matter be deferred until her group can review it.

Commissioner Bromenschenkel stated the program as submitted is so general that there would probably be no benefit in delaying action on it. He said he would agree to having Mrs. Altenburg's group work with Mr. Gaare in implementing the specifics of the Plan but sees no objections they could have to the generalities included in the Program as presented.

Mr. Gaare stated the City needs something desperately right now to include with all applications for Federal grants.

Mrs. Altenburg stated she would not object to the Board adopting this Program if her group has the right to work on the specifics and comprehensive portions of the Program.

Commissioner Schuster stated if Mrs. Altenburg's group reviews this Program and wishes any changes to be made, he will be happy to place the matter on the agenda for the next Regular Meeting.

On call of the roll Commissioners Pedersen, Stockman, Bromenschenkel, Schuster and Hentges all voted aye.

No Commissioner being absent and none voting nay, the motion was declared carried."

APPENDIX

*City of Fargo Police Department Job Description*

*Defendant's Exhibit 33.*

"CAR MARKER

*DISTINGUISHING FEATURES OF WORK:*

This is routine work of patrolling the downtown streets to check for overtime parking and other non-moving traffic violations and the issuing of traffic tickets therefore.

Specific assignments are reviewed [sic] from the Traffic Bureau and are carried out in accordance with established rules and procedures. Car Markers will work independently without direct supervision. Work is reviewed through reports and observations by supervisors. (Sergeant, Lieutenant and Captain, Traffic Bureau).

*ILLUSTRATIVE EXAMPLES OF WORK:*

Patrol designated districts of downtown streets on foot or via 3-wheel vehicle.

Mark tires of vehicles parked on downtown streets in assigned area.

Checks for overtime parking in designated areas.

Checks for double parking.

Checks for parking in restricted zone areas.

Checks for other non-moving violations, as designated by the department.

Makes court appearances.

Answers questions and offers information.

Issues tickets for non-moving violations.

Makes daily activity reports.

Reports to Police Department of suspicious and illegal activities.

Reports on undesirable conditions that exist. (i. e.) Broken sidewalks, traffic hazards, missing or twisted traffic signs or signals, possible other traffic violations.

Performs related duties as required.

*DESIRABLE KNOWLEDGES, ABILITIES AND SKILLS:*

Ability to deal with the general public effectively.

Ability to use good judgment.

Ability to follow directions, both oral and written.

Ability to maintain calm temperament under adverse conditions.

Knowledge of city streets and business locations.

Ability to give directions simply and understandably.

Ability to present a neat appearance.

*DESIRABLE EXPERIENCE AND TRAINING:*

Graduate of a standard high school or the equivalent.

Experience in dealing with the public.

*NECESSARY SPECIAL QUALIFICATIONS:*

Must be between ages of 21–35 years of age.

Must be able to pass the Police Departments physical examination.

Must have a valid North Dakota state drivers license."

### APPENDIX

*City of Fargo Police Department Job Description.*

*Defendant's Exhibit 34.*

### "POLICE OFFICER

*DISTINGUISHING FEATURES OF WORK:*

This is general duty police work in the preservation of the peace and protection of life and property through the enforcement of laws and ordinances.

Employees are responsible for the protection of life and property, prevention of crime, apprehension of criminals, and the general enforcement of laws and ordinances. Work is performed in accordance with departmental rules and regulations normally consists of routine patrol, preliminary investigation, and traffic regulation and investigative duties which may be performed in patrol cars, motorcycles, or on foot. Work may involve an element of personal danger and employees must be able to act without direct supervision and to exercise independent discretion in meeting emergencies. Assignments and general and special instructions are received from a superior officer who reviews work methods and results through reports, personal inspection and discussion.

*ILLUSTRATIVE EXAMPLES OF WORK:*

Patrols a designated area of the city on foot, on motorcycle, or in a radio-equipped patrol car to preserve the peace, to prevent criminal operations and enforce traffic regulations.

Answers calls and complaints involving drunkenness, domestic disputes, fires, automobile accidents, thefts and other misdemeanors and felonies.

At scene of crime administers first aid, conducts preliminary investigations, gathers or protects physical evidence, locates witnesses, and makes arrests.

Interviews complaints and takes appropriate enforcement or reporting action or directs them to proper authorities.

Directs traffic; investigates automobile accidents; locates stolen automobiles; and makes detailed reports.

Inspects and tests vehicles; takes pictures of vehicular and related accidents and casualties; operates a mobile public

address amplifier in warning motorists and pedestrians about existing hazards and minor traffic violations.

Prepares evidence for issuance of complaints; serves criminal processes, including warrants and subpoenas; testifies as a witness in court; makes reports of all activities and disposition of cases.

Checks time limit parking zones for overtime parking violations and issues traffic tickets to violators.

Occasionally performs investigative work in plain clothes.

Performs related work as required.

## DESIRABLE KNOWLEDGES, ABILITIES AND SKILLS:

Some knowledge of modern police methods and procedures.

Some knowledge of state laws and city ordinances.

Some knowledge of the geography of the city and the location of important buildings.

Some knowledge of first aid methods.

Ability to understand and carry out effectively simple oral and written instructions.

Ability to write a clear and concise report as required.

Ability to develop skill in the use of firearms. Ability to deal courteously and firmly with the general public.

Ability to react quickly and calmly in emergency conditions.

Ability to obtain a North Dakota State drivers license at time of appointment.

## DESIRABLE EXPERIENCE AND TRAINING:

Some experience in work involving public contact; and graduation from a standard high school.

## NECESSARY SPECIAL QUALIFICATIONS:

Candidates for positions of this class are required to meet such age, medical, and physical standards as may be prescribed by the Civil Service Commission."